**NATIONAL LABOR RELATIONS BOARD**

v.

**PACIFIC MILLS (Carrboro Woolen Mills Division).**

**No. 6634.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 20, 1953.

Decided Nov. 4, 1953.

Abraham Siegel, Atty., National Labor Relations Board, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Samuel M. Singer, Atty., National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Whiteford S. Blakeney, Charlotte, N. C., and T. Justin Moore, Richmond, Va. (Patrick A. Gibson, Richmond, Va., Pierce & Blakeney, Charlotte, N. C., and Hunton, Williams, Anderson, Gay & Moore, Richmond, Va., on the brief), for respondent.

Before PARKER, Chief Judge, DOBIE, Circuit Judge, and WILKIN, District Judge.

PER CURIAM.

This case is before us upon a petition of the National Labor Relations Board (hereinafter called the Board) for the enforcement of its order against Pacific Mills (hereinafter called Pacific), Carrboro Woolen Mills Division.

Two questions are before us:

(1) Whether substantial evidence on the record as a whole supports the Board's finding that respondent dis-

charged Employees Peterson, McKnight and Davis because of their union activity, thereby violating Section 8(a)(3) and (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a)(3, 1).

(2) Whether substantial evidence on the record as a whole supports the Board's finding that respondent interfered with, restrained, and coerced its employees in violation of Section 8(a)(1) of the National Labor Relations Act by engaging in surveillance of union meetings, interrogating employees concerning the Union, and making intimidating phone calls to union leaders.

The Board adopted the findings, conclusions and recommendations of the Trial Examiner.

### Sheila Peterson.

There was evidence that Peterson was the chief spokesman of the web-drawers in presenting their grievances to Pacific without success; that Peterson took their case to the State Labor Board which did nothing; that she threatened several of Pacific's supervisory officers to bring in a Union, which caused some consternation among these officers, and Personnel Manager Durham asked her not to "take it outside the mill."

In late October, 1950, Peterson got in touch with an official of the Textile Workers' Union and Union organizers came to Carrboro. There was evidence that Peterson was Pacific's most experienced and best web-drawer, who consistently earned more than any other web-drawer. She was discharged on November 10, 1950, though none of the other web-drawers was discharged, and she was replaced by an inexperienced and inefficient employee who subsequently was transferred to other work. There was further evidence that, after her threat to bring in the Union, difficult warps were assigned to Peterson and that grievance slips criticising her low production were filed against her.

We think there was sufficient substantial evidence to support the Board's finding that "respondent discharged Peterson, not because of low earnings, but because she had informed the Respondent of her intention to go beyond the mill family and seek the aid of a labor organization" in settling the web-drawers' grievances against the Company.

### Hazel McKnight.

Apart from the disputed overhearing of conversation in the ladies' rest-room by General Manager Clark and an equally disputed remark by Second Hand McCartney, there was no substantial evidence that Pacific officers even knew of the connection of McKnight with the Union. There was ample evidence that McKnight was a disturbing influence in the mill due to her loud and boisterous talking, for which she had been reprimanded and disciplined.

On one occasion McKnight flatly announced to McCartney: "I'm not going to do this cut of cloth." McKnight admitted that on this occasion McCartney instructed her twice to do the work in question and that she "never did do it." McKnight also admitted that a fellow employee, Louise Mann, commented to her at the time, with respect to McKnight's manner of speaking to McCartney:—"If I was Mac, I wouldn't take talk from the girls like that. I'd fire them."

Overseer Silverthorne testified that upon his explaining to McKnight's husband why she had been discharged, he commented:—"She always talks too much." The husband, while denying that he made such statement to Silverthorne, did admit that upon his coming home on the day of McKnight's discharge, she said to him "I've been fired," and that he asked her "for what," and that she replied "for talking too much." McKnight herself admitted that upon explaining her discharge to Floyd Durham, the Personnel Manager, she told him "I got fired for talking too much."

Upon this record, we must hold that there was not substantial evidence to support the Board's finding that Mc-

Knight was discriminatorily discharged on account of her Union activities.

### Roscoe Davis.

Davis was discharged on January 19, 1951. Starting at $1.25 an hour, Davis was earning $1.59 an hour when respondent discharged him, and was, admittedly, a satisfactory employee. Davis joined the Union at a meeting held on Wednesday, January 10, 1951. The next morning he informed Mechanical Superintendent Neal that he had become a Union member the previous night, and Neal replied that it was his privilege to join if he wanted to. Shortly thereafter, however, Neal told Davis that he was a "damn fool" for joining the Union and inquired why he had joined.

After revealing his Union membership to Neal on January 11, Davis continued in respondent's employ until Friday, January 19. During this period he solicited Union membership cards from 40 to 50 employees.

Neal informed Davis that he was being laid off "for lack of work." There was in fact a backlog of welding work on Davis' workbench on Friday, January 19, and the construction work to which he had been assigned remained to be completed. After Davis' departure, Jess Howard, a junior maintenance employee, was assigned the duties customarily performed by Davis. Subsequently, in October, 1951, after receiving the Board's complaint in the instant case, respondent offered Davis a fireman's job at $1.16 an hour. Davis declined this offer, which was less than his starting pay two and a half years earlier, explaining that because of his large family (a wife and six children) he could not possibly live on such a low wage.

We think there was substantial evidence to support the Board's finding that Davis was discharged because of his Union activity.

### Interference, Restraint and Coercion.

Following the discharge of Mrs. McKnight and Mrs. Peterson in October and November, 1950, respectively, the Union began accelerating its organizing campaign among respondent's employees, with the Peterson home as the focal point of the drive. The employees held their first Union meeting there in mid-December, 1950, and thereafter Union talk became more pronounced in respondent's mill. Respondent's attitude toward the Union found expression in Overseer Silverthorne's statement to Employee Edna Pepper, around Christmas time, that if he had any say in the matter he was not going to have a Union at the mill since Unions were always causing "trouble."

There was evidence that Supervisor Harward and Personnel Manager Durham knew beforehand of this and other Union meetings and knew who would be there. There was, too, evidence of surveillance of Union meetings by Durham, Fyfe, Andrews and Hoenin, officers of Pacific. Added to these facts was the interrogation of Davis as to his Union membership, the interrogation of employee Williams concerning the person by whom he had been solicited to join the Union and the evidence of the threatening telephone calls to the Petersons.

All this, we think, is substantial evidence in support of the Board's finding that Pacific had violated Section 8(a) (1) of the National Labor Relations Act.

Accordingly, with the deletion from the order of the provisions requiring the reinstatement of Hazel McKnight, the order of the Board, as thus modified, will be enforced.

Order modified and enforced.