**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LESTER BROTHERS, INC., Respondent.**

No. 8455.

United States Court of Appeals Fourth Circuit.

Argued Jan. 9, 1962.

Decided March 21, 1962.

Samuel M. Singer, Atty. N. L. R. B. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., on the brief), for petitioner.

John D. Epperly and W. R. Broaddus, Jr., Martinsville, Va. (Broaddus, Epperly and Broaddus, Martinsville, Va., on the brief), for respondent.

Before SOPER, HAYNSWORTH and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

The National Labor Relations Board petitions for enforcement of the Board's order requiring Lester Brothers, Incorporated, to cease and desist from certain activities found to be unfair labor practices and to reinstate two discharged employees, making them whole for any lost wages resulting from their discharge. The Board's order and decision are reported at 131 N.L.R.B. No. 145.

We shall discuss the evidence supporting each of the principal provisions of the Board's order, but a preliminary statement of facts will provide the setting for this labor-management dispute. Lester Brothers (hereinafter sometimes referred to as the Company) has been engaged in the manufacture, processing and sale of prefabricated houses, lumber and building supplies from its plant in Martinsville, Virginia, since 1946 and was operating in interstate commerce during the period here involved. In November 1959, the Brotherhood of Carpenters and Joiners of America, AFL–CIO (hereinafter referred to as the Union), began its efforts to organize the Company's employees. Some labor-management trouble developed soon thereafter, but a settlement agreement was reached whereby the Company pledged itself not to interfere with, restrain, or coerce its employees in their right to join the Union. A notice to this effect was conspicuously posted in the Company's plant from April 1 to May 31, 1960. Relying on the Company's good faith in posting the notice, Union organizers visited the employees in their homes, organizational activities were discussed and Union membership cards were circulated and signed. On May 26, 1960, the Union held its first organizational meeting. Thus the stage was set for the events which occurred within the next two weeks and with which we are here concerned.

*Company's Acts of Discrimination*

1. About five days after the Union's May 26 meeting, the Company held a "safety meeting" for its employees. At that gathering, the Company president, Lawson Lester, announced a new employee benefit which had never before been granted, namely, a week's vacation with pay for those persons who had been with the Company for at least a year. With respect to the Union's organization of the plant, Lester was quoted by an

employee who attended the meeting as saying that there was a big union leader named Hutchison who "had just pulled six months time"; that Hutchison had "a couple of stoolies" around the plant; and that the employees should be careful of those fellows since "they were just out for \* \* \* [your] money." Continuing, the employee told of Lester's further comments:

"And he said they didn't mean no good, because they just wanted a lot of money for themselves. And he called this fellow Hutchison a bastard. And the last thing he called him was a son of a bitch."

Lester was present at the hearing but did not testify. It is not denied that he made the statements substantially as reported.

It is said by the Board that the announcement of the vacation plan during the height of the Union's organizational activities was an effort on the Company's part to show the employees that they would be given benefits, even without a union, thus interfering with, restraining or coercing the employees in the exercise of their rights guaranteed by the Act. The Company denies that the vacation announcement was timed to interfere with union organization. Rather, it is argued, the vacation announcement was made approximately one year from the date when a foreman had inquired of President Lester about a paid vacation plan. Lester reportedly promised all the foremen that if the Company had a "fairly good year," all employees would be given a paid vacation the following year. No reason is given, however, why Lester waited until the end of May 1960 to announce the new benefit since the Company had had a "good year" in 1959.

An offer of new employee benefits at the time of Union organization, particularly in a context of union hostility, is a violation of section 8(a) (1) of the Act.[1] N.L.R.B. v. Epstein, 203 F.2d 482 (3rd Cir. 1953), cert. denied, 347 U.S. 912, 74 S.Ct. 474, 98 L.Ed. 1068 (1954); see May Dept. Stores Co. v. N.L.R.B., 326 U.S. 376, 381–386, 66 S.Ct. 203, 90 L.Ed. 145 (1945).

■ Lester's abusive language at the safety meeting with respect to the Union official, Hutchison, is not cited as a separate violation of the Act but such evidence was introduced to show hostility toward the Union by the Company's president. That it shows, without question. We cannot say that the Board's inferences from the testimony detailing all of Lester's remarks at the safety meeting here in question are unreasonable.

■ 2. Another unfair labor practice found by the Board was the Company's interrogation of employees in a coercive and interfering manner concerning their interest in the Union. The record reveals the following instances of employee interrogation by management personnel. On May 31, 1960, the last day the settlement notice was posted, Assistant Superintendent Lazenby approached employees Hobart Young and Henry Wray and asked Wray whether anyone had said anything to him about a union. When Wray answered that no one had, Lazenby advised him not to join and asked Young to tell Wray what had happened on an earlier occasion when the Union had made attempts to organize the Lester Brothers plant. Young told Wray that "they fired a whole bunch of the fellows," whereupon Lazenby laughed and walked away. Young testified that Lazenby's apparent attitude greatly concerned Wray because he (Wray) was already a member of the Union, though Lazenby was then apparently unaware of that fact.

About the same time Foreman Carmichael questioned William King to find out whether he had signed a Union card. King answered, "You know I wouldn't tell you if I had signed or if I hadn't." On June 2 Lazenby quizzed employees Charlie Witcher and Rorer Martin as to their Union membership. Martin quoted Lazenby as saying to him, "I didn't think you would join the union." Mar-

---

1. National Labor Relations Act, 61 Stat. 136, 140 (1947), 29 U.S.C.A. § 158(a) (1).

tin's reported answer was, "No one seen me sign any card."

The Company does not deny that management personnel questioned some of the employees about their union activities and membership, but it is said that interrogation of workers concerning union activities is not necessarily an unfair labor practice. In support of this principle, the Company relies upon N.L. R.B. v. Ford, 170 F.2d 735 (6th Cir. 1948), and United Fireworks Mfg. Co. v. N. L. R. B., 252 F.2d 428 (6th Cir. 1958). In each of those cases there is dicta to support the Company position, but the holdings are squarely against it since in each case the Sixth Circuit Court of Appeals concluded that there was evidence to support the Board's finding that interrogation of employees by company officials was coercive and interfered with union activities. In N. L. R. B. v. West Point Mfg. Co., 245 F.2d 783 (5th Cir. 1957), and N. L. R. B. v. Williams, 195 F.2d 669 (4th Cir.), cert. denied, 344 U. S. 834, 73 S.Ct. 42, 97 L.Ed. 649 (1952), it was held that coercive interrogation of employees by Company officials constitutes a violation of the Act. We think the evidence related above is sufficient to sustain the Board's finding on this point.

■ 3. The Board found that the Company engaged in surveillance of Union meetings and fostered the impression that such meetings were watched. The Company directly denies this charge and states in its brief in this court, "There was not a scintilla of evidence about surveillance." The record reveals the falseness of the Company's statement. On the night of June 2, the Union held its second organizational meeting but attendance was by invitation only. Vernell Hamlette, an uninvited Company employee, appeared at the meeting and was asked to sign a visitors' pad or a Union membership card. He refused to sign either. Then, upon request of the meeting's leader, Hamlette left the meeting. Employee Young testified that it "was suspicioned" that Hamlette was a "stooly." "So, we didn't want to have the meeting while he was there." The next day at the plant Foreman Carmichael approached employees Hobart Young and John Taft Cooper and said, "Hobart and Taft both was at the union meeting last night." When asked by Young and Cooper how he knew who had been at the meeting, Carmichael answered that he had not personally attended the meeting but that he knew who had been there. That same day, Lazenby approached Young and asked, "How was things at the meeting last night?" Young replied, "Didn't Hamlette tell [you]?" Lazenby answered that "he had some more fellows at the meeting that would tell him" what happened there, according to Young's testimony.

The Company concedes that constant surveillance and intimidation of employees by management "might be an unfair labor practice." In N. L. R. B. v. Collins & Aikman Corp., 146 F.2d 454 (4th Cir. 1944), it was held that any real surveillance by the employer over the union activities of employees, whether frankly open or carefully concealed, falls under the prohibition of the Act. Accord, N. L. R. B. v. Pacific Mills, 207 F. 2d 905 (4th Cir. 1953) ; N. L. R. B. v. Carolina Mills Inc., 190 F.2d 675 (4th Cir. 1951). The Board has determined as fact that the Company engaged in surveillance, and there is ample evidence to support such finding.

■ 4. Also charged as an unfair labor practice is the Company's suggesting to employees that notices posted pursuant to Board order do not apply to all Company officers, agents and supervisors. Referring to the settlement notice which had been posted until a few days prior to June 3, when Young asked Lazenby, "If they didn't want us to join the union why did they put up the government sign that said you was free to join the union if you wanted to and they wouldn't interfere with us?", Lazenby answered by pointing out that he had not signed the notice yet he was the one who did the hiring and firing, not the new supervisor (Pinkard) whom the Company designated to sign the notice and whose signature did appear thereon. Employee Cooper

was also questioned by both Lazenby and Carmichael about the June 2 Union meeting which he, Cooper, had attended. Cooper explained, "I wouldn't have joined the union if I hadn't been going by the sign on the clock that said you could join the union." Lazenby replied that neither his nor Carmichael's name appeared on the notice. Lazenby and Carmichael then asked John Lewis Reed and Fred Martin if they had joined the Union. Martin replied that "there is a sign on the time clock that says it is all right to sign if you want to." Carmichael then observed that "the men are just hurting themselves." He told some of the workers that he had lost his job at another plant as a result of his union activities.

█ 5. The Board also found that employees were threatened with discharge or other economic reprisals because of their union activities. Again, the finding is adequately grounded. In addition to Carmichael's remark as indicated in the preceding paragraph, the record reveals that Lazenby reportedly told employee King that "a whole lot of men can lose their job by messing with" the Union. Also, according to the testimony of employee Charlie Witcher, Assistant Foreman Gilbert admitted to Witcher that Carmichael was "kind of mad" about the Union on the morning of June 3. Gilbert was quoted as telling Witcher, "They done sent a gang of them up the hill [2] on account of it [the Union]. And if they don't mind, they going to send some more." The Company does not comment on this evidence or this charge.

6. Also charged as an unfair labor practice was the Company's curtailing employee privileges or enforcing previously unenforced company policies at such time and in such manner as to interfere in the exercise of employee rights guaranteed by the Act. It is undisputed that the Company announced on the morning of June 3 that certain work rules theretofore ignored or laxly enforced would be strictly enforced. Fore-

man Carmichael, in announcing the policy change, said that if the rules were disobeyed, "I am going to fire you. And I don't have to tell you why, because you already know."

█ The Company offers no comment on this charge. We conclude that the Board was not unwarranted in determining from the evidence that the sudden enforcement of the rules, reasonable in themselves, at the height of union organizational efforts, constituted an unfair labor practice, particularly when combined with the threat of *dismissal* for infringement of rules, the violation of which normally, we think, would not violate plant security or otherwise seriously affect the plant's operations.

### The Discharges

█ The Board has ordered reinstatement of two former Company employees, Rorer James Martin and Charles M. Craig, who allegedly were discharged because of their Union activities; the Company is also ordered to pay the two men for any wage loss they may have suffered as a result of their wrongful discharges. We conclude that there is substantial evidence to sustain this part of the Board's order.

Rorer James Martin was first employed by Lester Brothers in September 1954. He worked until July 7, 1955, when his relationship with the Company terminated; the personnel records bear the notation, "Quit—Discharged." Martin was rehired on October 18, 1955, and except for a brief period between January 30 and April 10, 1956 (when he was in layoff status), he worked regularly until discharged on June 3, 1960, that being the day after the Union's second meeting for employees. Martin worked as "lead man" on a three-man team which laid out and nailed together gable ends for prefabricated houses.

Martin joined the Union in November 1959 at the request of the Union's International representative. He became a leader of the Union's organizational drive

2. "Up the hill" is a term used by the employees to mean discharged or fired.

at the plant and assisted the International representative in visiting the employees' homes to persuade them to join the Union. Martin personally distributed approximately forty Union membership cards and was directly responsible for thirty-five persons joining the Union.

On the morning of June 3, Martin reported to his gable-end table at seven o'clock, the usual time to begin work. A short time thereafter, Foreman Carmichael approached the table where Martin and his co-workers were constructing a sweep-type gable end. Carmichael watched the men for about five minutes, then walked away without making any comment. Shortly afterwards Lazenby came by and silently watched the men for several minutes. About fifteen minutes later, at 8:30 A. M., Lazenby called Martin and his two co-workers into his office and handed them their time cards marked "unsatisfactory work." No further explanation for the firing was given them.

The Trial Examiner and the Board found that the Company discriminated against Martin in discharging him because of his Union leadership; the two additional employees, both of whom were comparatively new on the job, were sacrificed in order that the Company might accomplish its objective of getting rid of Martin, according to the Board's finding.

The Company denies that Martin was dismissed because of his Union activities. It is contended that his inefficiency and slowness on the job and his belligerency were the real reasons for the discharge. It is undisputed that Martin was a slow worker, but he had been employed by the Company for several years prior to the date of his discharge in question and, until that morning, he "was not doing anything to get a reprimand on," according to Lazenby's testimony. Carmichael testified that Martin knew how to build gable ends and that it was anticipated that he would do a good job. Although Carmichael claimed that Martin's table had spent as much as an hour and a half on a single gable end, whereas another three-man team working on gable ends had actually completed two gable ends in the same length of time on the morning of the discharge, the Board found that Martin's table had actually worked on two gable ends during this period. Such a finding is supported by the evidence. This court does not determine the credibility of witnesses where there is a conflict of testimony concerning a disputed fact. N. L. R. B. v. Southland Mfg. Co., 201 F.2d 244 (4th Cir. 1952). Moreover, the "faster" gable-end table crew with which Carmichael compared Martin and his crew was working on conventional gables, whereas the second gable on which Martin was working was an unusual one made of redwood which, according to the testimony, is more difficult to work with because it splits easily.

There is thus ample evidence in the record to support the Board's finding that Lazenby's and Carmichael's close supervision of Martin's table on the morning of June 3, at which time they rather suddenly decided that he was too inefficient for continued employment by the Company, was motivated by union hostility and a desire to be rid of Martin who was known by the Company to be a strong Union leader.

Charles M. Craig began working for Lester Brothers in June 1957 and was regularly employed there until he was laid off on June 3, 1960. The first year he worked as a driver, but in June 1958 he was assigned to the task of helper in a shipping crew. A month later he was made a "head" shipper, a job which made him the lead man on a three-man shipping crew. His duties, in addition to doing the physical work with his helpers, also required him to see that the trucks were properly loaded. He continued as a head shipper until his employment was terminated, at which time the Company had five shipping crews, including Craig's. Craig was the senior head shipper in terms of service, and there were only two men in the shipping department with more seniority. The

shipping crews were paid according to the number of trucks they loaded, not by the hour or any other time period.

Craig became a Union member about two weeks prior to his discharge. At the request of Rorer Martin, Craig passed out Union membership cards to fellow employees. Craig had about ten or twelve of the signed cards returned to him and he turned them over to Martin. Craig also attended the two Union meetings for employees, one on May 26, the other on June 2.

On the afternoon of June 3, Craig found a slip attached to his regular pay check bearing the following statement:

"Due to the shortage of shipments at the present time we will have to reduce our labor force temporarily. We hope to recall you in the very near future."

At the time of the hearing in September 1960, Craig had not been recalled to work.

The Board found that Craig was discharged because of his Union membership and activities and was not laid off for business reasons, as contended by the Company. Though business was admittedly slow at the time of Craig's dismissal, it was shown that Lester Brothers had a high rate of personnel turnover. During the period between January 1 and June 20, 1960, 68 employees quit voluntarily and 94 persons were hired, including 16 persons between June 3 and June 20. Moreover, as previously indicated, Craig and the other shipping crew workers were paid on a piece-rate basis; the Company had in the past solved the work shortage problem by reducing the hours of its shipping crews but retaining all the crews. On one occasion when it was necessary to lay off men in the shipping department, those persons with low seniority were laid off, not a senior employee such as Craig.

The Company offers a number of reasons why Craig was laid off rather than other persons in the shipping department. It is charged that Craig was a constant complainer, used profane language and that he did not get along well with the other employees. It is also pointed out that a few days before he was discharged (according to the Board's finding, not merely laid off), Craig, while backing a truck in the plant's yard, had knocked down a stack of bricks and had failed to restack them. The truck was large and noisy, however, and Craig was unaware that he had knocked over the bricks. His supervisors, who were aware of the incident, admittedly did not· call the matter to his attention, either at the time of occurrence or when he was laid off. On another occasion, Craig dropped and ruined a small secretarial desk, the *retail value* of which was $35. When reprimanded for this act, he volunteered to pay for the desk and to quit. His superiors failed to take advantage of either offer, however.

The Board found that the Company discriminatorily discharged Craig because of his Union activities and not for the several reasons advanced by management personnel. There are several inconsistencies in the testimony of the Company witnesses concerning the reasons for Craig's discharge, and the Hearing Examiner and Board were not required to believe such testimony.

Following the standard of review established by the United States Supreme Court in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), we are of the opinion that there is substantial evidence in the record as a whole to support the Board's findings on which the order is based. The enforcement decree will be entered in accord with section 10(e) of the National Labor Relations Act, 61 Stat. 136, 147 (1947), as amended, 29 U.S.C.A. § 160(e) (1961 Supp.).

Enforcement granted.