NORTHERN VIRGINIA STEEL CORPO-
RATION, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 8450.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 8, 1962.

Decided March 13, 1962.

Henry St. J. FitzGerald, Arlington, Va. (Tolbert, Lewis & FitzGerald, Arlington, Va., on the brief), for petitioner.

Hans J. Lehmann, Atty., N. L. R. B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Samuel M. Singer, Atty., N. L. R. B., Washington, D. C., on the brief), for respondent.

Before SOBELOFF, Chief Judge, and BRYAN and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Chief Judge.

Northern Virginia Steel Corporation petitions the court to review and set aside an order of the National Labor Relations Board finding it guilty of violations of section 8(a) (1), (3) and (5) of the Labor Management Relations Act, 29 U.S.C.A. § 158(a) (1), (3) and (5). The order contains the usual directive to offer reinstatement to certain discharged employees and unfair labor practice strikers, and to cease and desist from refusing to bargain with the Union and interfering with its employees' right to organize. The Board counters with a prayer for enforcement. The Union in interest is the Shopmen's Local Union No. 486 of the International Ass'n of Bridge, Structural and Ornamental Iron Workers, AFL–CIO.

The specific issues are whether there is substantial evidence to support the Board's findings that (1) employee Combs was not a supervisor within the meaning of section 2(3) of the Act; (2) employee Combs, as well as employees Colley, Hippeard, Lingafelt and Taylor were discharged because of their union membership and activities; (3) the company refused to bargain with the Union, which represented a majority of the employees of an appropriate bargaining unit; and (4) the strike of 31 employees resulted from the company's unfair labor practices.

The company contends that the record shows beyond peradventure that Combs was a supervisor and, therefore, not pro-

tected by the Act; that in any event, Combs and the other four employees were discharged for misconduct; that the 31 strikers are not entitled to reinstatement because the strike was an economic one; and that the Union was not entitled to recognition because Combs, allegedly a supervisor, had solicited members for the Union.[1] Alternatively the company contends that it acted in good faith and did not refuse to bargain within the meaning of section 8(a) (5).

■ On one point the examiner and the Board were not in agreement. The examiner thought that Combs "responsibly directed" other employees and was a supervisor, although at the hearing before him the company's witnesses testified that he was not. The company now maintains that he was a supervisor, and that the Board erred in holding that he was not.[2] In all other material respects, the decisions of the Board and its examiner are in harmony. We, of course, must affirm the findings of the Board if, on the whole record, they are supported by substantial evidence. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 487–488, 71 S.Ct. 456, 95 L.Ed. 456 (1951), interpreting section 10(e) of the Act.[3]

As the company argues that the Union's majority status was infected by Combs' solicitation of memberships for the Union, and this in turn, as well as the forfeiture of Combs' right to reinstatement, is dependent upon his being a supervisor, we will address ourselves first to a consideration of the nature of his job.

### Combs' Status

■ The company was organized in August, 1958, and is in the business of fabricating, processing and selling steel joists and similar items in interstate commerce. At all relevant times, it employed about fifty workers. Thirty of

1. See Insular Chemical & Rubber Corp. v. N. L. R. B., 128 N.L.R.B. 93 (1960).

2. The Board's order with respect to Combs' status is as follows:

"The Trial Examiner found that E. B. Combs was a supervisor within the meaning of the Act. We do not agree with this finding. Combs worked with a crew of from two to eight welders. He was handed blue prints for particular projects by the shop superintendent and, in following the blue prints, he performed manual work along with the rest of the crew. The personnel of the crew changed frequently and assignments to the crew were made by the shop superintendent with Combs playing no part in the selections. Combs could not himself hire or fire employees and any recommendations he made in that regard were subjected to review by superior authority. Unlike night supervisor Pence, there is no indication in the record that Combs ever granted employees time off the job.

"While the Trial Examiner found that Combs was salaried, as distinguished from other employees, and that he was expected to work overtime without additional compensation, we are not persuaded that this constitutes sufficient indicia of supervisory status in an overall appraisal of Combs' duties. Moreover, we note that at no time during this proceeding, before the Intermediate Report

was issued, did the Respondent contend that Combs was a supervisor, nor was his status placed in issue. In point of fact, during the hearing herein, the Respondent affirmatively indicated that it considered Combs to be within the bargaining unit and not among its supervisory personnel.

"We find, in agreement with the General Counsel's contentions, that Combs was not a supervisor, but at most was a lead man or gang leader who was more experienced and skilled than the other members of the crew. We further find that the discharge of Combs, based upon the evidence and reasons found by the Trial Examiner, was violative of Section 8(a) (3) and (1) of the Act."

It might be noted that the Board did not expressly overrule its examiner's secondary finding that Combs "responsibly directed" other employees, but this defect is not fatal since the findings of the Board on which its decision rests are fully set forth. See 5 U.S.C.A. § 1007(b); Colorado-Wyoming Co. v. Federal Power Comm., 324 U.S. 626, 634, 65 S.Ct. 850, 89 L.Ed. 1235 (1945); In re United Corp., 249 F.2d 168, 177–83 (3rd Cir. 1957).

3. For an enlightening discussion of the substantial evidence rule, see Jaffe, Judicial Review: Questions of Fact, 69 Harv. L.Rev. 1020 (1956).

these worked on the day shift, 6:30 a. m. to 3:00 p. m., and the remainder on the night shift which ended at 11:30 p. m. During the day shift, company officials present were General Manager Baxter, Shop Superintendent Corbett, Assistant Shop Superintendent Futrell, and Purchasing Agent Dillon. At night, when operations were substantially diminished, only one man, Charles Pence, was left in charge.

E. B. Combs, who the company asserts was a supervisor, was hired in January, 1959, and, as far as the record shows, he held only one job during his tenure of employment. Referred to interchangeably at the hearing as a "gangleader," a "fitter," a "lay-out man," and a "straw boss," he worked on the day shift with a crew of two to eight welders in the fabrication of long span structural steel shapes. His primary task was to lay out and piece together the structural materials for welding according to plans and blueprints given to him by Shop Superintendent Corbett. In the performance of his job, he worked manually along with the welding crew, the composition of which changed frequently at Corbett's direction. Combs could not grant time off, nor was he empowered to hire or fire. Although when first employed, Combs was paid an hourly wage, soon thereafter, at his behest, he was put on a straight weekly salary.

The company points to six factors, from which, it insists, we should conclude that the Board erred in finding that Combs was not a supervisor: He was paid a straight weekly salary; he checked the work of the welders to see that they were welding in the right place with a proper amount of weld; he could make recommendations with respect to hiring and firing; he was in charge of maintaining production of long span steel joists; and, lastly, the company relies on the trial examiner's finding that Combs "responsibly directed" other employees.

■ Under section 2(3) of the Act, 29 U.S.C.A. § 152(3), "any individual employed as a supervisor" is excluded from the definition of the term "employee" and, therefore, from the protection of the Act. Section 2(11) defines a supervisor as:

"* * * any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

The company directs us to certain court decisions holding that the statutory definition of the term supervisor is phrased in the disjunctive, so that an employee who has authority in the interest of the employer to perform any of the enumerated acts in the exercise of independent judgment may acquire the status of supervisor.[4] But this begs the question to be decided; for as stated by Judge Soper in an analogous case: "It is a question of fact in every case as to whether the individual is merely a superior workman or leadman who exercises the control of a skilled worker over less capable employees, or a supervisor who shares the power of management." N. L. R. B. v. Southern Bleachery & Print Works, 257 F.2d 235, 239 (4th Cir. 1958).

Indicative that Combs exercised no genuine management prerogative is the fact that his work was closely supervised by others. Also, he did not assign work or decide what work was to be done; simply, by following blueprints, he pieced together the structure to be welded, and saw to it that the welding was done according to plan. Unlike the

---

**4.** See, e. g., Ohio Power Co. v. N. L. R. B., 176 F.2d 385, 387, 11 A.L.R.2d 243 (6th Cir. 1949); N. L. R. B. v. Edward G.

Budd Mfg. Co., 169 F.2d 571, 576 (6th Cir. 1948).

"dock chiefs" in N. L. R. B. v. Southern Airway Co., 290 F.2d 519, 523 (5th Cir. 1961), Combs, in performing his duties, exercised no discretion or independent judgment. See Precision Fabricators v. N. L. R. B., 204 F.2d 567, 568–69 (2d Cir. 1953).

The company argues that Combs was responsible for long span production, but perhaps the best evidence in regard to the range of his authority is found in the testimony of the company's witnesses before the trial examiner. At the hearing the company was of the view that Combs was not a supervisor, and, to a man, its witnesses testified that Combs was no more than a sub-foreman. Indeed, General Manager Baxter testified that Combs' work had been so good (up until about six weeks before his discharge) that the company was planning to promote him to a "supervisor's job." In addition, it is noteworthy that the 30 employees on the day shift were continuously supervised by Baxter, Corbett, Dillon and Futrell, so that there was no disproportionate relation between the number of supervisors and employees. See N. L. R. B. v. Southern Bleachery & Print Works, supra, 257 F.2d at 239.

Other factors emphasized by the company as showing Combs' supervisory status are not inconsistent with the Board's finding. Many skilled workers are paid a straight salary and exercise some degree of direction over the less skilled. The same is true of Combs' asserted power to suggest hirings, firings and transfers—which the record shows was actually exercised only one time—for trusted non-supervisory employees often are looked to for such suggestions.

In summary, we think the evidence ample to sustain the Board's conclusion that Combs was no more than a "gang-leader," and, therefore, outside the disqualifying statutory provision. See Poultry Enterprises v. N. L. R. B., 216 F.2d 798, 800–801 (5th Cir. 1954), discussing the legislative history of section 2(11).

Heavy reliance is placed by the company on the fact that the Board and the examiner were not in accord in regard to Combs' status, but the examiner's conclusion was basically a deduction drawn from undisputed facts from which the Board was at least equally competent to draw its own conclusion. Nevertheless, obedient to the Supreme Court's directive in the Universal Camera case,[5] we have considered the examiner's finding along with the other factors and have concluded that it fails to detract from the substantiality of the testimony previously cited, which persuaded the Board.

### Motive for the Discharges

■ The Union's organizing activity began about June 20, 1959, and within a week 36 of the 50 employees had signed up. This success was due mainly to the efforts of Combs who was president of the Union. At a Union meeting held on the evening of July 1, attended by about 25 employees, stewards and committeemen were elected, and it was unanimously agreed to strike if the company fired anyone for union activity.

5. In Universal Camera Corp. v. N. L. R. B.. 340 U.S. 474, 496–497, 71 S.Ct. 456, 468 (1951), the Court said:

"We do not require that the examiner's findings be given more weight than in reason and in light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case. To give it this significance does not seem to us materially more difficult than to heed the other factors which in sum determine whether evidence is 'substantial.'"

Cf. United States Retail Credit Ass'n v. F. T. C., 300 F.2d 212 (4th Cir. 1962).

The very next day, Superintendent Corbett told Combs that his work had not been satisfactory and summarily discharged him.[6] The following morning, July 3, employees Lingafelt, Colley, Taylor and Hippeard were discharged without explanation. All four had signed Union authorization cards.

At the hearing, several of the company's witnesses asserted, initially, that the company had no knowledge of the Union's organizational activities, and therefore could not have been motivated to discharge the five employees for this reason. However, later in the hearing it became clear that at least two of the supervisors did know that organizational efforts were under way. Indeed, night supervisor Pence had sent employee Justice to the Union meeting of July 1 for the purpose of observing and bringing back information. Because of Pence's close relationship to higher management, the examiner concluded, and the Board agreed, that Pence revealed his information to company officials. This conclusion is adequately supported and is not attacked on appeal.

To show a legitimate reason for Combs' discharge, the company tendered evidence that on numerous occasions he had been tardy in reporting on the job, and about three weeks before his dismissal had absented himself without permission for three days. They also claimed that the job on which Combs was working when he was discharged was several hours behind schedule.

While he admitted that on one occasion, about a month before his discharge, he had taken three days off without permission, Combs denied having taken unauthorized leave or reporting late on any other occasion. Also, Combs admitted that the job was a few hours behind schedule, but he explained that the lapse was not at all serious and could have been made up. He asserted that the structure on which he was working was of a new

type and that progress would necessarily at first be a little slow.

In addition, Shop Superintendent Corbett testified that Combs forgot to put certain reinforcement plates (stitch plates) on several of the structures being fabricated on July 1. But on rebuttal, Combs testified, and it was not denied, that these reinforcement plates were not put on because Futrell, the man in charge of supplying the plates, did not have them ready on time.

To establish the company's anti-union animus as one step in the proof of the unlawful reason for discharging Combs as well as the four other employees, the Union showed through employee Mullins that Pence told him on the day of the Union meeting that Hengen, the chief operating official of the company, had threatened to close down the plant and sell the equipment and steel before he would let the Union in. Mullins also testified that Pence told him that he had "better stick with the company" because jobs were hard to find. Employee Scott related a similar conversation with Pence. Even more to the point, Mullins stated that Pence confided to him on July 2 that Combs was discharged because the company learned of his union activity. To the same effect, employee Tighe testified that Shop Superintendent Corbett told him on the afternoon of July 2 that Combs was discharged for union activity. Corbett denied it, but the examiner found: "I consider Tighe to be a more credible witness than Corbett."

Corbett also denied knowing that Combs was president of the Union, but this was refuted by one of the company's own witnesses: Pence testified that Corbett told him on July 3 that he knew when Combs was hired that he was the president of the Union, but that Combs had promised not to engage in Union organizing until the company "got on its feet."

---

6. It is interesting, in connection with the question of Combs' status, to observe that "unsatisfactory work" was the ostensible reason for his dismissal, rather than disloyalty to the company, which would be the more natural accusation against a supervisor who had participated in union organization.

Both the examiner and the Board concluded that Combs was discharged for his union activity, and we think the record fairly supports them. Indeed, this is one of the rare instances in which direct evidence, credited by the examiner, was offered to establish the company's true motive for discharging an employee. See N. L. R. B. v. Dan River Mills, Inc., 274 F.2d 381, 384 (5th Cir. 1960).

As to Lingafelt, Taylor, Colley and Hippeard, the company contends that these were discharged for slacking on the job. The Union, however, offered evidence that Lingafelt was a good worker whose performance had never been criticized; that Taylor had been promised a raise in pay just one day before his discharge; that Hippeard worked overtime a couple of weeks before his discharge and was complimented for this, and his work was not complained of at any time thereafter; and that Colley was discharged without his work ever having come under criticism.

■ With the record in this state we could not properly overturn the Board's finding, paralleling that of the examiner, that these four employees were discharged for union activity. Where the finding of the Board "is supported by circumstances from which the conclusion of discriminatory discharge may legitimately be drawn," it is binding on the court, and we are without power to substitute our judgment for that of the Board. N. L. R. B. v. Spartanburg Sportswear Co., 246 F.2d 366, 367 (4th Cir. 1957). See N. L. R. B. v. Empire Mfg. Corp., 260 F.2d 528, 530 (4th Cir. 1958).

■ The proof tending to show the employer's reason for discharging the four men is not direct, as it is in the case of Combs, but "[t]he Board was justified in relying on circumstantial evidence of discrimination and was not required to deny relief because there was no direct evidence * * *." N. L. R. B.

v. Link-Belt Co., 311 U.S. 584, 602, 61 S.Ct. 358, 367, 85 L.Ed. 358, 367 (1941).

### The Reason for the Strike

About 11:30 a. m., on July 3, two hours after the four employees were fired, 21 of the remaining day shift employees walked out. Joined by the dischargees, they congregated on an adjacent street. When the night shift arrived, nine more men joined the strikers. At this point the Chief Operating Director of the company, Hengen, came on the scene and attempted to persuade them to return to work. He told the night shift employees that if they did not go to work, he would consider them as having quit. The strikers, however, stood their ground.

■■ On July 6, a one man picket line was set up, but this was discontinued shortly before the trial examiner's hearing. The legend on the picket sign was, "Iron Shopmen's Local Union 486, AFL–CIO, on strike for recognition by Northern Virginia Steel Corporation." The trial examiner and the Board both were persuaded that in the context of the entire record the walkout was an unfair labor practice strike in protest of the illegal discharges. This conclusion is substantially supported. The employees had voted at the Union meeting on July 1 to strike if anyone was fired for union activity, and, indeed, there is direct evidence that at least two employees expressly told Hengen and Corbett that this was the reason for the walkout. There was, it is true, also evidence that a couple of the employees told Hengen that they walked out because of the low wages being paid by the company, the inference being open that the strike was, in part, an economic one. It has been consistently held, however, that "where the causes contributing to a strike consist of unfair labor practices and employees' desires for wage betterments, the latter should not excuse the employer from the legal consequences that flow from its conduct which transcends the permissible bounds under the National Labor Relations Act." Berkshire Knitting Mills v.

N. L. R. B., 139 F.2d 134, 137 (3rd Cir. 1943), quoted with approval in N. L. R. B. v. Stilley Plywood Co., 199 F.2d 319, 320–21 (4th Cir. 1952). See N. L. R. B. v. West Coast Casket Co., 205 F. 2d 902, 907 (9th Cir. 1953).

The contention that the 21 employees, having accepted their full wages, intended to quit when they walked out cannot prevail. For one thing, they did not ask for their full wages, but only their pay for the week ending June 30. Also, the strike followed hard on the heels of the illegal discharges. The Board was justified in rejecting the naive suggestion that the employees had chosen to terminate the employer-employee relationship. The examiner and the Board had sufficient ground for their determination that the men struck in protest of the discriminatory discharges.

### The Company's Refusal to Bargain

■ When the workers struck on July 3, the Union's attorney, Fath, telephoned Hengen, informing him that the Union represented a majority of the employees, and sought to arrange a meeting for collective bargaining. After some delays a meeting was finally arranged for August 4 between representatives of the employer and the employees. Collective bargaining negotiations, however, were never commenced. The company demanded proof from the Union that it represented a majority of those employees who worked on a fixed date, namely, Monday, July 7, thereby unwarrantedly excluding those who were then on strike. The theory of the company was that the strikers could not be considered employees. The Union insisted that in ascertaining whether it represented a majority, the strikers were to be counted.[7] The meeting ended in a deadlock.

7. There is no doubt that unfair labor practice strikers are counted in determining the majority status of the union. See N. L. R. B. v. Greensboro Coca-Cola

The examiner found that the employer's refusal to negotiate violated section 8(a) (5) and resulted in a continuation of the unfair labor practice strike.

The company defends on the ground that its refusal to bargain was predicated on a "good faith" doubt, even if mistaken, as to the Union's majority status and that, therefore, the Board erred in finding a company violation of section 8(a) (5) and in ordering bargaining with the Union. The argument advanced is that because the company acted in "good faith" the Board should not compel it to bargain with the Union. The Board and examiner agreed in finding that "good faith" was lacking.

It is unnecessary, however, to linger over the bona fides of the company's conduct, for the Board's order was proper whether or not the company acted in good faith. Such an order was expressly authorized by the Supreme Court in International Ladies Garment Workers v. N. L. R. B., 366 U.S. 731, 740, 81 S.Ct. 1603, 1608, 6 L.Ed.2d 751 (1961). The Court said:

"Assuming that an employer in good faith accepts or rejects a union claim of majority status, the validity of his decision may be tested in an unfair labor practice proceeding. If he is found to have erred in extending or withholding recognition, he is subject only to a remedial order requiring him to conform his conduct to the norms set out in the Act, as was the case here. No further penalty results. We believe the Board's remedial order is the proper one in such cases."

The company's petition will be dismissed and a decree enforcing the decision and order of the Board will be entered.

Board's order enforced.

Bottling Co., 180 F.2d 840, 844 (4th Cir. 1950); N. L. R. B. v. A. Sartorius & Co., 140 F.2d 203, 206 (2d Cir. 1944).