NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

OVERNITE TRANSPORTATION COM-
PANY, Respondent.

No. 8497.

United States Court of Appeals
Fourth Circuit.

Argued March 22, 1962.

Decided Sept. 4, 1962.

Robert Sewell, Attorney, National La-
bor Relations Board (Stuart Rothman,
Gen. Counsel, Dominick L. Manoli, Asso-
ciate Gen. Counsel, Marcel Mallet-
Prevost, Asst. Gen. Counsel, and Melvin
Pollack, Attorney, National Labor Rela-
tions Board, on the brief), for petitioner.

Ernest W. Machen, Jr., Charlotte, N.
C. (J. W. Alexander, Jr., and Blakeney,
Alexander & Machen, Charlotte, N. C., on
the brief), for respondent.

Before SOBELOFF, Chief Judge, and
BRYAN and J. SPENCER BELL, Cir-
cuit Judges.

SOBELOFF, Chief Judge.

This is a companion case to 308 F.2d
284. The National Labor Relations

Board here seeks enforcement of an order issued against the Overnite Transportation Company, finding violations of sections 8(a) (1), (3), and (5) of the National Labor Relations Act, 29 U.S. C.A. §§ 158(a) (1), (3), (5) (1956). The questions presented are whether the Board erred in finding (1) that the company unlawfully interfered with its employees' right of self-organization, (2) that the company discharged employees Luther Naves and Greene King, Jr., for their union activity, and (3) that the company failed to recognize and bargain in good faith with the union as the representative of a majority of its employees.

## I. INTERFERENCE IN VIOLATION OF SECTION 8(a) (1).

The case arises out of union efforts to organize the 30 employee drivers, maintenancemen, and warehousemen at the company's terminal in Asheville, North Carolina. Union activity began there in February, 1959, and by the middle of March, 19 of the 30 employees had signed union authorization cards. On March 25, the company was notified by telegram of the union's majority status and requested to confer for purposes of recognition and collective bargaining. The company did not reply, and on March 27, a second request for negotiations was made, this time by letter. Again the communication went unanswered.

There is much evidence, however, that the matter was not ignored by the company. On March 26, Terminal Manager Gregg summoned employee Greene King, Jr., to his office and interrogated him about the union. Asked how he felt about the union, King replied that he thought it "would be a benefit to all the employees," and when asked why, he replied, "it would be better pay, better hours." King was discharged four days later. About the same time, Terminal Manager Gregg told employee Arrowood that the company president intended to close the first terminal that went union. On April 7, Gregg asked employee Dowdle whether he would like to withdraw from the union, telling him that "now is the time." Dowdle replied that he was not in the union. The evidence is unclear whether it was during this interview or earlier that Gregg thanked Dowdle for being "loyal" to the company and told him, as he had told Arrowood, that the company would move its Asheville terminal before it would let it "go union." Also early in April, Dispatcher Miller summoned employee Belcher into Gregg's office. Belcher admitted that he belonged to the union and volunteered to write a letter of resignation. Gregg wrote down what the letter should contain. When on the following day Belcher told Gregg that he had decided against withdrawing from the union, Gregg stated that this would not be held against him, but added that if he would resign, he would be given a better job. A day or two later, Gregg asked Belcher's wife to induce Belcher to drop his union membership.

Employee Revis was asked by Gregg, while discussing promotion, whether he had been "crazy enough to sign a union card." Shortly thereafter Gregg advised Revis that the company had heard of his participation in the union. Late in March employee Riddle was questioned by Gregg about the union. When Riddle admitted to having joined, Gregg asked him to resign from the union. It appears that the same evening Gregg helped Riddle write his letter of resignation. Also, about April 20, Gregg asked employee Brown, "What are you going to do, go with me and the company or go with the die-hards?" This was an allusion to a previous conversation between the two men in the course of which Gregg had asked Brown if he would like to withdraw from the union. While Brown had been undecided at this first conversation, on April 20 he replied to Gregg that he would "go with the die-hards."

Gregg was not unassisted in his efforts, for in the meantime General Manager Price officially announced the company's opposition to the union. In a speech to the employees delivered on April 1, shortly after the union's bargaining requests, Price stated that the

company had been fighting the union for twenty years and did not intend to recognize it. He pledged that "all lawful" means would be used to oppose the union. "Loyal" employees were praised, and those who had made the "mistake" of joining the union were urged to talk to company supervisors about withdrawing.

The company recognizes of course that interrogation and intimidation of employees with respect to their union activities is clearly unlawful. See N. L. R. B. v. Jones Sausage Co., 257 F. 2d 878 (4th Cir. 1958); N. L. R. B. v. Taitel, 261 F.2d 1, 4 (7th Cir. 1958). As to Price's speech, while the rule is that a noncoercive statement of the employer's views about the union is not prohibited, the invitation to the employees to talk with company supervisors about withdrawal from the union, in the context of the entire speech, transcends permissible limits. Much of this evidence is not denied by the company, and the Board's finding that the company violated section 8(a) (1) of the Act is not seriously contested.

## II. DISMISSALS IN VIOLATION OF SECTION 8(a) (3).

The company's principal attack is upon the Board's finding that employees Greene King, Jr., and Luther Naves were discharged for union activity. Strenuously, it maintains that the record shows beyond doubt that these two employees were discharged for misconduct and that therefore they are not entitled to reinstatement and back pay as ordered by the Board.

### Greene King, Jr.

King began working for the company in 1956 as a driver, but in the months preceding his discharge on March 30, 1959, most of his time was spent as a checker at the terminal. At the time King was discharged, he was told that he had been making too many loading errors and receiving too many telephone calls. However, at the hearing King testified that his work had not previously been criticised and that he did not receive any more calls than other employees. The company has apparently abandoned these two reasons as justification for King's discharge.

Before the examiner the company asserted that King was discharged because he was taking his lunch breaks early. The company points to its rule that checkers shall work at least four hours before taking off for lunch. It urges that since the record is undisputed that King worked only two hours before taking lunch on the four days immediately before his discharge, the examiner's finding that King was discharged for union activity is arbitrary. But we do not think that the examiner was bound to accept the company's explanation. There is direct evidence in the record that the company's "four hour rule" was not as inflexible as contended. While Terminal Dispatcher Miller testified that this rule was applicable to all employees, the record stands uncontradicted that King had lunch with six to ten other employees on the days preceding his discharge. It is noteworthy that the misconduct attributed to King was not perpetrated in secret; rather, he openly punched out his time card each time he went to lunch. This casts doubt on the reason stated by the company for discharging King.

Moreover, King's employment was terminated almost immediately after the company learned of the union's activity at the Asheville terminal. The company's argument that it had no knowledge of King's union membership is without support. It is true that King did not expressly tell Gregg that he had joined the union on February 10, but it was a fair inference from King's statement to Gregg, given on March 26 at the height of the union's organizing campaign, that he felt the union "would be a benefit to all the employees." King was discharged only four days later. Where the finding of the examiner " 'is supported by circumstances from which the conclusion of discriminatory discharge may legitimately be drawn,' it is binding on the court, and we are without power to substitute our judgment for that of the

Board." Northern Virginia Steel Corp. v. N. L. R. B., 300 F.2d 168, 174 (4th Cir. 1962); see N. L. R. B. v. Spartanburg Sportswear Co., 246 F.2d 366, 367 (4th Cir. 1957); N. L. R. B. v. Empire Mfg. Co., 260 F.2d 528, 530 (4th Cir. 1958).

### Luther Naves

This man was a tractor trailer driver assigned to short runs in the Asheville-Hendersonville area. He was hired in July, 1958. Since it was known that he had been previously employed by a unionized company, he was admonished, he testified, not to talk about the union to anyone. When discharged on April 21, he was told it was because he had excessive unreported absences and had, that morning, used a Mack tractor without permission and improperly unhooked the tractor from its trailer.

In connection with the last asserted ground, the record shows that Naves did have permission to use the Mack truck on the day of his discharge. He testified that, because he was given a larger load than usual, he desired to use a powerful Mack truck instead of the gas-burning, White truck he regularly used. He asked permission from Foreman Clark who approved his request to use a Mack tractor. Clark denied this, but the examiner found Naves to be a more credible witness, and we cannot disturb this resolution of credibility. Naves found an unused Mack tractor, and while unhooking the trailer from the tractor, he apparently did not properly secure the trailer's landing gear, for the trailer was an old type with which Naves was not familiar. Consequently, when the tractor was pulled away, the landing gear flew back up and the front end of the trailer dropped to the ground. No damage was done, however.

As to the excessive unreported absences, advanced by the company as a reason for Naves' discharge, the record affirmatively shows that he was ill during the week preceding his discharge, but that his wife called in each morning to tell Foreman Clark that he would not be in that day. The evidence establishes this to be the usual practice, and there is no warrant for Gregg's comment to Naves when discharging him that his wife should have followed a different procedure for reporting his absence. Likewise, Gregg told Naves that he should have brought in a letter from his doctor, but the evidence is that this procedure was not the normal company requirement.

In addition to these asserted justifications, Gregg accused Naves of not caring about "Overnite's rules and regulations." This charge Naves stoutly denied, and he asked to be confronted by his accusers. Gregg thought this unnecessary and discharged him. Nor was Gregg able before the examiner to produce supporting facts.

The record before the examiner, therefore, showed that all but one of the reasons advanced by the company for Naves' discharge found little or no basis in the facts. And the one act of misconduct the company was able to substantiate—the trailer unhooking incident—was minor and resulted in no damage to the company. The examiner could well decline to credit this alleged ground for discharge. Here, as in the case of King, we think the examiner was within his authority in concluding that Naves was discharged for union membership. "The Board was justified in relying on circumstantial evidence of discrimination and was not required to deny relief because there was no direct evidence * * *." N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 602, 61 S. Ct. 358, 367, 85 L.Ed. 368 (1941).

The company argues that the examiner showed bias by resolving all conflicts in the facts in favor of the union. However, a third employee, Arrowood, was found by the examiner to have been laid off for violating company rules, rather than for his union membership. More to the point, the Supreme Court has expressly held that the fact that the examiner and Board uniformly credit the Board's witnesses and as uniformly discredit those of the employer does not of itself "impugn the integrity or competence of a trier of fact." N. L. R. B. v.

Pittsburgh S.S. Co., 337 U.S. 656, 659, 69 S.Ct. 1283, 1285, 93 L.Ed. 1602 (1949).

### III. REFUSAL TO BARGAIN IN VIOLATION OF SECTION 8(a) (5)

As to the section 8(a) (5) violation, the company contends that its refusal to recognize and bargain with the union was based on good faith doubts as to the union's right to recognition. The company argued to the examiner that its good faith doubt rested upon information that the union made threats of violence to obtain its majority status. However, all those employees who were questioned at the hearing denied that they had received any threats and denied further that they had reported any to Gregg or to any other company supervisor. At the most, the evidence shows some rumors circulating among truck drivers generally, at diners and like places, about the union's use of forceful means to gain members. The evidence fails to show that any of these reports were made by Overnite employees, and indeed it is unclear whether they originated with union or non-union men. The examiner found that the company had no grounds for a good faith doubt as to the union's majority status because of the alleged coercion, and the company on appeal did not strongly stress this argument.

The claim of good faith is pressed more vigorously on the ground that thirteen times within the past two years, the union had claimed to represent a majority of the employees at various of Overnite's terminals, although never before at the Asheville terminal. Each time, the union's claims were unsubstantiated: either the union failed to produce sufficient authorization cards or it lost a National Labor Relations Board representation election. In view of this consistent course of conduct, it is argued, the company was justified in doubting and consequently ignoring the union's demands.

■ We think that the examiner correctly discounted this argument. A un-

ion's unsuccessful attempts at organizing other branches of a company's operations may not be relied upon by an employer to refuse at a different branch either to recognize the union or at least to undertake some inquiry into the actual extent of the union's representation. Moreover, in this case the evidence unmistakably demonstrates that the company gave some credit to the union's claims, for Terminal Manager Gregg and General Manager Price began their course of unlawful interrogations and speeches immediately upon receiving the union's March 25 telegram and March 27 letter, requesting recognition and bargaining. This course of conduct is an absolute refutation of any good faith doubt on the part of the company.

[6] The order which the Labor Board seeks to enforce in this case requires the company upon request to bargain collectively with the union as the exclusive representative of the employees. The record fully establishes that the union represented a majority of the employees when on March 25, 1958, it first presented its claim for recognition to the company, and we may presume in the absence of any contrary evidence in the record that the union still represents the majority. If the company on March 25, 1958, sincerely doubted the union's majority status, it could have challenged the union to substantiate its claims by checking the union cards against the payroll or by requesting the Labor Board to hold a representation election as is its right under section 9(c) (1) (B) of the Act, 29 U. S.C.A. § 159(c) (1) (B) (1956). But the company may not now claim that it has a right to such an election after having first attempted to defeat the union by means of conduct violative of sections 8(a) (1) and 8(a) (3). Such a rule would encourage employers to commit unfair labor practices rather than promote the freedom of employees to decide for or against a union in an atmosphere free from restraint or coercion. Moreover, it would delay the right of the majority to have a union bargain for them

beyond the four years' delay already caused by the company's unfair labor practices. The order of the Board was proper.

Enforcement Ordered.