322 F.2d 457
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
INLAND MOTOR CORPORATION OF VIRGINIA, Respondent.
 No. 8885.
 United States Court of Appeals Fourth Circuit.
 Argued April 3, 1963.
 Decided September 10, 1963.
 
 Allen M. Hutter, Atty., N. L. R. B. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin Pollack, Atty., N. L. R. B., on brief), for petitioner.
 William W. Sturges, Charlotte, N. C. (Weinstein, Waggoner & Sturges, Charlotte, N. C. and Dillow & Andrews, Pearisburg, Va., on brief), for respondent.
 Before HAYNSWORTH, BOREMAN and J. SPENCER BELL, Circuit Judges.
 HAYNSWORTH, Circuit Judge.
 
 
 1
 The sole question is the sufficiency of the evidence to support the Board's finding that employee Schwichtenberg was a supervisor within the meaning of § 2(11) of the National Labor Relations Act[1] and thus ineligible to vote in a representation election.
 
 
 2
 Inland Motor Corporation of Virginia was organized in 1958 for the purpose of manufacturing electro-dynamic components. As its labor force was expanding, District 50, United Mine Workers of America, sought to organize the employees. On January 27, 1960, a Board-ordered election was held. The Company then had seventy-eight employees, of whom fifty-six were production employees. Fifty ballots were cast in the election, of which twenty-five favored representation by District 50, twenty-two ballots were counted against the Union and three ballots, challenged by the Union, were not counted. The Regional Director overruled two of the Union's challenges, but sustained the third. None of the three challenged ballots were opened, however, for the result of the election could not be affected by opening and counting only two of them. The Board sustained the Regional Director's determinations and certified the Union as the collective bargaining representative of all of the production workers. Since there is no right of judicial review in representation cases, the Company refused to bargain with the Union, after which a complaint charging it with a violation of § 8(a) (5) of the Act[2] was filed and a full hearing was had.
 
 
 3
 The Trial Examiner found that employee Schwichtenberg was a supervisor and was not entitled to vote in the election. Three members of the Board agreed with the Trial Examiner; the other two members dissented. The Board's enforcement petition brings the question here, but, since the question is a factual one, we must accept the finding of the Board majority provided there is support for it upon the record considered as a whole and despite the fact that we might agree with the Board minority that the weight of the evidence is the other way.[3]
 
 
 4
 Milton Schwichtenberg was a tool and die maker in the Punch Press Department. Until early in September 1959, that Department had been supervised by Frank Syzbiak, who was also the foreman of the Machine Shop. When Syzbiak left, Noel O'Brien became foreman of the Machine Shop, but he did not have tool and die making skills and was given no supervisory duty respecting the Punch Press Department. Thereafter and until sometime after the election, the Punch Press Department was said to be under the immediate supervision of James Brooks, the Company's Production Manager who had general supervision over all of its departments. In July 1960, six months after the election, Schwichtenberg formally was made foreman of the Punch Press Department. At the time of the election, the Department had five employees, including Schwichtenberg. It does not appear how many employees the Department had in July 1960 when Schwichtenberg formally became foreman, but the total number of employees had increased from seventy-eight on January 27, 1960, when the election was held, to one hundred and seventy-five on July 11, 1961.
 
 
 5
 Schwichtenberg, the only tool and die maker in the Punch Press Department, spent approximately six hours a day making and repairing dies. With the dies that he had made, he set up the punch presses, sent samples of the work to the Inspection Department, and, when the samples had passed inspection, turned the set up press over to a press operator. When a punch press operator encountered difficulty, he called upon Schwichtenberg for assistance, and Schwichtenberg would help him solve the problem. Schwichtenberg also kept the time records.
 
 
 6
 It is beyond question that at the time of the election Schwitchtenberg did not have the status of the foremen of other departments. The foremen of all of the other departments were paid a salary, and the salary of each one of them continued if he were out sick or took time off. The foremen did not punch the time clock, were allowed an hour for lunch and could take time off without permission, but did not get extra pay for overtime. Their vacation plan differed from that of the hourly employees. Schwichtenberg, on the other hand, was paid on an hourly basis and, like all the rest of the hourly paid employees, he had to punch the time clock, and he got no pay if he were out sick or took time off. He had but a half hour for lunch and had to punch in and out. He could not take time off without permission, but was paid time and a half for overtime. His vacation rights accrued under the plan applicable to all hourly paid employees.
 
 
 7
 It is also clear that Schwichtenberg did not have some of the authority which, unquestionably, was vested in the acknowledged foremen of the other Departments. The Company contends he was simply a lead man, who had no more authority at the time of the election than he had when he worked under the immediate direction of foreman Syzbiak.
 
 
 8
 On the other hand, it is equally clear that after Syzbiak left, Brooks, the Production Manager, and Hugo Unruh, the President, were more dependent upon Schwichtenberg than they had been theretofore, and they consulted him about a number of matters affecting the Punch Press Department and its other employees. He was invited to attend some of the meetings of supervisors, those in which it was expected that matters affecting the Punch Press Department were to be discussed. He also attended a Christmas, 1959, party, otherwise attended only by supervisory and administrative personnel.
 
 
 9
 There was evidence that Schwichtenberg was consulted when pay increases were being considered for punch press operators, and there was testimony, not uncontradicted, that on one occasion when an increase of ten cents an hour was proposed for a punch press operator, Schwichtenberg suggested it ought to be fifteen cents, and the suggestion was accepted. On another occasion, a foreman of the Inspection Department consulted Schwichtenberg in an effort to find somebody qualified to work in the Inspection Department. Schwichtenberg recommended one of the punch press operators to him, and that man was transferred to the Inspection Department. Schwichtenberg assigned press operators to the newly set up presses but the jobs did not change, on the average, more frequently than approximately twice a week, and the night shift operators successfully assigned themselves in accordance with the production schedule. However, Schwichtenberg was supposed to report any difficulty in meeting the schedule, and, while he could not, himself, authorize overtime work for the punch press operators, or for himself, he was expected to recommend it when he thought it necessary. He had no authority to hire or to fire, but, as we indicated, he was consulted when higher officials were evaluating other employees in the Punch Press Department.[4]
 
 
 10
 From the foregoing, it is apparent that Schwichtenberg, after Syzbiak left and until he was formally made foreman of the Punch Press Department, was a borderline case. His status as a supervisor within the meaning of § 2(11) of the Act was equivocal. His position was very similar to that of Combs, whose status we very recently considered in Northern Virginia Steel Corporation v. N. L. R. B., 4 Cir., 300 F.2d 168. We sustained a finding there that Combs was not a supervisor, it having been there in the interest of the employer to have him clothed with supervisory status. Indeed, Schwichtenberg's position would appear to be quite indistinguishable from that of Combs, except for the fact that Combs was more closely supervised than was Schwichtenberg. The exception, however, may be of considerable importance, and, while the Board ought not to treat similar jobs dissimilarly in determining questions of supervisory status, the Act places upon it the power and duty to draw the ultimate inference of fact.
 
 
 11
 We may find more persuasive the opinion of the dissenting members of the Board and wonder that the Board in resolving this kind of factual question would be undisturbed that the result would be to impose upon a much larger group of employees in an expanded plant a bargaining agent selected by a small minority of twenty-five of them, but those are considerations for the Board, and the courts are vested with no authority over them. Limited as we are to a determination of whether or not there is support in the record for the Board's finding that Schwichtenberg was a supervisor within the meaning of the Act, we must sustain the finding. The underlying findings that he could effectively recommend wage increases and transfers, and that he responsibly directed the punch press operators, in light of the absence of close supervision by any other foreman, are not without evidentiary support, and they support the ultimate finding of the Board and require enforcement of the Board's order.[5]
 
 
 12
 Order enforced.
 
 
 
 Notes:
 
 
 [1]
 29 U.S.C.A. § 152(11)
 
 
 [2]
 29 U.S.C.A. § 158(a) (5)
 
 
 [3]
 Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Walton Manufacturing Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829
 
 
 [4]
 The President and the Production Manager testified that after Syzbiak left in September 1959, they were more dependent upon Schwichtenberg for information about the Punch Press Department, its operation and the performance of its other employees. They testified, however, that they sought no more than information from Schwichtenberg, and if they had received any recommendation from Schwichtenberg it would not have been accepted as a substitute for their own independent investigation and the exercise by them of their own independent judgment
 Schwichtenberg clearly had nothing to do with some routine pay increases granted to employees in the Punch Press Department. As to the fifteen-cent increase given Taylor, the testimony at the hearing was that the President and the Production Manager were considering a pay increase crease for Taylor, the former favoring an increase of fifteen cents to equalize Taylor with another press operator who was receiving that much more than Taylor, while the latter thought ten cents was enough. They consulted Schwichtenberg, who was in a position to closely observe both employees, as to whether Taylor performed as well and efficiently as his more highly paid fellow. Schwichtenberg thought he did.
 At the hearing, Schwichtenberg testified that he could not then recall the details of the conversation about an increase in Taylor's wages. In an affidavit executed shortly after the election, however, he had stated that he recommended an increase of fifteen cents when "the company" was considering an increase of only ten, and that his recommendation was accepted.
 The record would abundantly support the inference that no more than information was sought of Schwichtenberg, and that, of course, would not elevate him to supervisory status.
 
 
 [5]
 N. L. R. B. v. Lee-Rowan Co., 8 Cir., 316 F.2d 209