**FLORENCE PRINTING CO., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 9302.

United States Court of Appeals
Fourth Circuit.

Argued April 15, 1964.

Decided June 10, 1964.

**290**

William H. Smith, Jr., Columbia, S. C. (E. D. Smith, Jr.; McKay, McKay, Black & Walker, Columbia, S. C., and Wright, Scott, Blackwell & Powers, Florence, S. C., on brief) for petitioner.

.Richard P. Lawlor, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Solomon I. Hirsh, Atty., N. L. R. B., on brief), for respondent.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Chief Judge.

Florence Printing Company, a newspaper publisher in Florence, South Carolina, petitions this court to review an order of the National Labor Relations Board finding the company in violation of 8(a) (1) & (5) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1) & (5), and ordering the reinstatement of certain striking employees with back pay and interest. The Board cross-petitions for enforcement.

On June 25, 1962, two officials of the Charleston Typographical Union, No. 43, presented to John M. O'Dowd, the president and publisher of the company, a written demand for recognition. The collective bargaining unit sought by them consisted of composing room employees, teletypesetters and proofreaders. Nineteen of the company's 75 employees are within this unit, and the union officials claimed to have the consent of 14 of these. To this demand O'Dowd replied that "I will not sign a union contract," and refused to consent to a secret election conducted by a third party of his choice. When asked if he would recognize the union if a majority status were proved by the employee-members of the union presenting themselves to him, he said he would not. He did ask for a list of the names but this was refused because he told the union officials that on a prior occasion he was successful in beating the union once he knew the identity of the members.

## I. INTERFERENCE IN VIOLATION OF SECTION 8(a) (1)

Four days after the initial request for recognition, O'Dowd wrote the union informing it that "[t]he Company doubts your majority status" and that the union would not be recognized until it was certified in an election conducted by the National Labor Relations Board. From then on through September 5, 1962, when 13 of the 19 employees in the unit went on strike, the company remained adamant in its position.

■ The Board found that during this period two company supervisors, Harris and Holland, engaged in unfair labor practices in an attempt to defeat the union. The testimony disclosed that both Harris and Holland told employees that the plant would shut down before O'Dowd would negotiate with the union. Harris promised employees better pay and hours and longer vacations if they would withdraw from the union, and Holland warned composing room employees that apprentices would be laid off if the union succeeded. The company does not now attack the credibility findings of the Board's examiner, nor does it claim that there was an absence of

substantial evidence on which the Board could find a violation of section 8(a) (1). Indeed, it is perfectly clear that the course of conduct followed by Harris and Holland constitutes an unfair labor practice. N.L.R.B. v. Overnite Transportation Co., 308 F.2d 279 (4th Cir.1962); N.L.R.B. v. Jones Sausage Co., 257 F. 2d 878 (4th Cir.1958).

The company's contention is that Holland was not a supervisor and that therefore his conduct should not be attributed to it. Whether the company is correct in this we need not determine, for it is not material to the decision of this case. Admittedly, Harris was a supervisor and his conduct alone was sufficient to constitute a violation of section 8(a) (1).

## II. APPROPRIATENESS OF THE UNIT

■ The company contends that the unit approved by the Board is not appropriate. It says that proofreaders and teletypesetters should not have been included because their work is less skilled than that performed by the linotype operators in the composing room, and because they are separated from the composing room and work in another room in the printing shop.

On the evidence in this record we agree with the Board. All of the members of the unit are under common supervision. Their work is closely related and they often work together. Both linotype operators and teletypesetters produce type for copy. Linotype operators perform the function directly; teletypesetters use a machine whose keyboard is similar to that of a typewriter. By typing copy, teletypesetters make perforations on a tape which is eventually brought to the composing room and fed into specially outfitted linotype machines. As found by the Board "the chief function of linotype operators and teletypesetters is the production of type for copy, and the only difference is the mechanical means employed for the task."

Both linotype operators and teletypesetters do proofreading, while proofreaders do that exclusively. Unquestionably, proofreading is an essential function in the preparation of type for copy.

■ The history of collective bargaining in the printing industry also indicates that the unit chosen here for collective bargaining is appropriate. Berea Publishing Co., 140 N.L.R.B. 516 (1963); Uarco, Inc., 71 N.L.R.B. 605 (1946). The Board's use of this history for precedential weight was proper. N.L.R.B. v. Somerville Buick, Inc., 194 F.2d 56, 59 (1st Cir.1952).

■■ It is well established that the Board has wide discretion in selecting the appropriate collective bargaining unit. Packard Motor Car Co. v. N.L. R.B., 330 U.S. 485, 67 S.Ct. 789, 91 L. Ed. 1040 (1947); N.L.R.B. v. Overnite Transportation Co., 327 F.2d 36, 39–40 (4th Cir.1963). Here the history of collective bargaining in the industry and the community of interests among the composing employees make the appropriateness of the unit manifest. The fact that other units might also be appropriate would not defeat the choice made by the Board, if this was appropriate. N.L.R.B. v. Overnite Transportation Co., supra; N.L.R.B. v. Quaker City Life Insurance Co., 319 F.2d 690 (4th Cir.1963).

## III. REFUSAL TO BARGAIN IN VIOLATION OF SECTION 8(a) (5)

■ The company claims that its refusal to bargain was based on its good faith belief that the union did not have the support of a majority. Absolutely no reason was advanced to the union to substantiate this asserted belief. The company now argues that it was unsure that the unit sought by the union was appropriate. But clearly this is an afterthought, and, as we have held, an incorrect one. Even if the company entertained doubt, it is no defense to a refusal-to-bargain charge where the unit is proper. Northern Virginia Steel Corp. v. N.L.R.B., 300 F.2d 168, 175 (4th Cir. 1962).

■ The union claimed to represent a majority and offered to prove its as-

sertion. The evidence in fact demonstrates that the company's initial refusal, made by O'Dowd, did not even rest on any doubt as to majority status. O'Dowd simply told the union representatives that he would "not sign a union contract." Having taken its stand, the company's subsequent unlawful interrogations, promises, and coercion are "an absolute refutation of any good faith doubt on the part of the company." N.L.R.B. v. Overnite Transportation Co., 308 F. 2d 279 (4th Cir.1962).

If the company had any doubts when it was approached by the union, it could have agreed to the private election suggested by the union or it could have itself petitioned the Board under section 9(c) (1) (B) for a representation election. Refusing to pursue either course, it acted at its peril.

Order enforced.