**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LIFETIME DOOR COMPANY,**
Respondent (two cases).

Nos. 11294, 11295.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 10, 1967.

Decided Feb. 1, 1968.

---

Stanley Lubin, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L.

Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Herman M. Levy, Atty., N. L. R. B., on brief) for Petitioner.

Wm. H. Smith, Jr., Columbia, S. C. (E. D. Smith, Jr., Columbia, S. C., on brief) for respondent.

Before SOBELOFF, BOREMAN and BRYAN, Circuit Judges.

SOBELOFF, Circuit Judge:

The National Labor Relations Board petitions this court for enforcement of its order directing the Lifetime Door Company to cease and desist from unfair labor practices in violation of section 8 (a) (1), (3), (4) and (5) of the Act and, affirmatively, to offer reinstatement to one employee illegally discharged, to rescind all warnings issued to a second employee who had testified at a Board hearing, and to recognize and bargain with the Union as the exclusive representative of the designated unit of employees.[1] Since there is substantial evidence in the record as a whole to support the Board's findings, its order will be enforced. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The Company is engaged in Denmark, South Carolina, in the business of manufacturing doors. The organization of its plant began in November, 1964, when an organizer for the United Brotherhood of Carpenters and Joiners enlisted the support of a former employee, Mose Busby, in a drive to solicit union authorization cards. After obtaining signatures from 27 of 43 employees, the Union sent a letter on December 1, 1964 to the Company requesting that it recognize the Union as the exclusive bargaining agent for the defined unit [2] and bargain over wages, hours and other working conditions. On the same day the Union filed a representation petition and an election was scheduled for January 22, 1965.

*Interference, Coercion and Restraint*

About two weeks before the election date, the Company began a concerted effort calculated to discourage employees from voting for the Union. Several employees were summoned by the assistant plant manager, W. E. Martin, and told that they could vote as they chose, but were advised to vote "no" because a Union victory would lead to the closing of the plant and would discourage other companies from moving into the area. During the entire two week pre-election period, Company supervisors interrogated various employees about their Union views and intentions in the forthcoming election. Employee Tyler testified that he was told by a supervisor that he would vote no because he had a family. Others testified that they had been warned that a Union victory would mean the closing of the plant and the general reduction of jobs since companies would be reluctant to move into the community and those already there would refuse to hire Union supporters.[3]

The Company attempted to impeach the credibility of these employees by intro-

1. Two cases have been consolidated for the purposes of this appeal. The charges of restraint and coercion, discriminatory discharge, and refusal to bargain were combined before the trial examiner in Case No. 11,294 and the Board's decision and Order is reported at 158 NLRB No. 3. The subsequent § 8(a) (4) charge resulted when the Company took disciplinary action against an employee who had testified at the earlier proceedings and the Board's Decision and Order is reported at 160 NLRB No. 32.

2. The unit requested was "all production, maintenance, and yard employees; exclud[ing] all supervisory, office clerical, professional and technical employees, and guards as defined in the Act." The Company's answer admits the appropriateness of this unit.

3. The Union lost the election 31 to 6. The Board concluded, however, that the Company's interference with the employees' right to exercise a free and untrammeled choice required that the election be set aside. On the basis of the findings and order with respect to the § 8(a) (5) violation no new election was ordered. For the reasons clearly enunciated in Daniel Construction Co. v. NLRB, 341 F.2d 805, 808–810 (4th Cir. 1965), that portion of the Board's order setting the election aside is not reviewable by this court at this time.

ducing affidavits taken by the Company's lawyer prior to the hearing. While statements in the affidavits did, in some instances, vary from the testimony elicited at the hearing, it was for the trial examiner to resolve these factual conflicts and questions of credibility. NLRB v. Lester Bros., Inc., 301 F.2d 62, 68 (4th Cir. 1962). In so doing, the trial examiner found that the interviews at which the affidavits were taken were not conducive to frank disclosures and he credited the employees' direct testimony at the hearing.

■ It was properly within the province of the Board to determine whether the pre-election threats and interrogations were coercive in nature, tending to restrain the employees in the lawful exercise of their section 7 rights. The Board found that the employer's conduct was coercive and had a tendency to restrain, and this conclusion is supported by substantial evidence.

### Discriminatory Discharge

Nine days before the election, Mrs. Rosa Busby was dismissed, ostensibly because of continued tardiness and absenteeism. The Board found that the explanation tendered by the Company was pretextuous, and that she was in fact discharged for her Union activity.

Both Mrs. Busby and her husband had been extremely active in the organizational campaign; three meetings were held at their home, the last on the evening before her discharge. She was dismissed suddenly and without warning on a day when she had been one minute late.[4] At the hearing, another employee testified that shortly after Busby's discharge he was warned by a supervisor, "[y]ou had better be careful around here because Mrs. Busby has just been fired on account of working for the union."

■ The Company insisted that it acted within its rights in discharging an employee with a record of two absences and two instances of tardiness in a single month.[5] But, when the circumstances surrounding the dismissal cast doubt on the employer's motivation, neither the Board nor the trial examiner is bound to accept his explanation. They are empowered to conduct their own inquiry and when their findings are " 'supported by circumstances from which the conclusion of discriminatory discharge may legitimately be drawn,' it is binding on the court, and we are without power to substitute our judgment for that of the Board." Northern Virginia Steel Corp. v. N. L. R. B., 300 F.2d 168, 174 (4th Cir. 1962); N. L. R. B. v. Overnite Transportation Company, 308 F.2d 279, 281, 282 (4th Cir. 1962).

Finding substantial supporting evidence for the Board's conclusion, we enforce its order to reinstate Mrs. Busby to her former or a substantially equivalent job with back pay.

### Refusal to Recognize and Bargain

After accumulating authorization cards from 27 of the 43 employees (63%) in the designated unit, the Union sought recognition from the Company. Its request went unanswered. Concluding that the Company's refusal was not based on a good faith doubt of the Union's majority status, but rather on the Company's desire to gain time in which to undermine that majority, the Board ordered the Company to bargain collectively with the Union.

■■ The record is barren of any evidence of a good faith doubt as to the reliability of the cards. There is no hint of impropriety in the solicitation or execution of the cards and the record fully supports the Board's conclusion that all

---

4. The evidence indicated that Mrs. Busby's normal shift began at 8:00 a. m. but she had been asked to report at 7:00 on the day she was discharged. She testified that when her supervisor requested that she report at the earlier hour she indicated that she might not be able to make it that early, and that he then told her to get to work as early as she could. Mrs. Busby checked in at 7:01 a. m.

5. While Mrs. Busby had been absent twice, on both occasions she called the plant office and her absences were excused.

27 were valid. Before us the Company makes no attempt to assert a bona fide doubt, but instead relies on its alleged "duty" to withhold recognition until a representation election has been held. The courts have uniformly held that absent a good faith doubt as to the Union's majority status, the employer is obligated to bargain. N. L. R. B. v. Sehon Stevenson & Co., 386 F.2d 551 (4 Cir. 1967); N. L. R. B. v. Overnite Transportation Co., 308 F.2d 279 (4 Cir. 1962); Jas. H. Matthews & Co. v. N. L. R. B., 354 F.2d 432 (8 Cir. 1965); N. L. R. B. v. American Manufacturing Co. of Texas, 351 F.2d 74 (5 Cir. 1965); Irving Air Chute Co. v. N. L. R. B., 350 F.2d 176 (2 Cir. 1965); N. L. R. B. v. Winn-Dixie Stores, Inc., 341 F.2d 750 (6 Cir. 1965). If the Company genuinely doubted the Union's majority status and believed that the issue must necessarily be resolved by a representation election, it was within its power to initiate the electoral machinery under 9(c) (1) (B) of the Act, 29 U.S. C.A. § 159(c) (1) (B) (1956). The course chosen, however, was not only to ignore the Union but to engage in a series of unfair labor practices clearly intended to dissipate the Union's strength.

■ In these circumstances the Board concluded that the remedy best suited to rectify the Company's unfair labor practices is to order the Company to bargain with the Union representative. "It is for the Board, not the courts to determine how the effect of prior unfair labor practices may be expunged." International Ass'n of Machinists, etc., v. N. L. R. B., 311 U.S. 72, 82; 61 S.Ct. 83, 89, 85 L.Ed. 50 (1940). The Board's order is entitled to enforcement.

### Warnings in Violation of Section 8(a) (4)

■ The day after testifying at the first Board hearing,[6] Willie Galloway returned to work and was questioned by his supervisor as to the reason for his absence the preceding day. Then within the span of about four days, Galloway received three warnings—two oral and one written—concerning the quality of his work. On the basis of the evidence, the examiner found:

"In view of the relatively close time sequence between his testimony and the warnings; the fact that no warning was ever given to Galloway prior to his testimony although he had been previously experiencing the same difficulty in operating the trim saw; the fact that no warning notices had been previously issued to any employee; and the fact that he testified on behalf of the General Counsel and in support of the Union in the prior Board case, I find that the warnings were retaliatory measures, taken because he testified at the prior Board Hearing, and were calculated to discourage his union activities."

Because substantial evidence supports this finding, we will enforce the order to withdraw all three warnings, so that the employee's employment status will not be adversely affected by them.

### Claim of Examiner's Bias

■ The Company's final contention is that it was denied due process when the trial examiner who sat in the first of the two cases, now consolidated, and had not yet issued his opinion, was permitted to conduct the second. The argument is premised on the fact that the trial examiner had made findings on the credibility of the various witnesses in the first hearing, and these would necessarily create a bias in the examiner when the same parties and same witnesses appeared in the second proceeding.

We find no merit in this contention. The trial examiner's findings and conclusions in each case were based on the record before him. There is no evidence of prejudice.

Enforcement granted.

BOREMAN, Circuit Judge (concurring specially).

In November of 1964 the Union commenced a campaign to organize Company

---

6. See footnote 1, supra.

employees. By letter of December 1, 1964, addressed to the Company, the Union demanded recognition, claiming that it represented a majority of the employees in a specified bargaining unit and requested a meeting with the Company on December 2, 1964, at a designated place or, if it should not be convenient for the Company to meet at that time and place, that the Union be advised so that a mutually convenient time and place might be selected. However, by letter of the same date the Union filed a petition for an election seeking certification as the exclusive bargaining representative of the employees in the designated unit. On December 31, the Regional Director directed a secret ballot election to be held on January 22, 1965. The Company ignored the Union's request for a meeting and it does not appear that at any time thereafter the Company formally responded to the Union's demand for recognition. The Company insists that under the circumstances it was not only entitled but was under a *duty* to withhold recognition of the Union pending the results of the election.

There was evidence to support a finding that twenty-seven out of forty-three of the employees in the unit had signed union cards which clearly authorized the Union to act as collective bargaining agent in dealing with their employer with regard to wages, hours and other conditions of employment. From the evidence submitted before the Examiner there was no hint of impropriety in the solicitation or execution of the cards and there was strong evidence to support the finding that all twenty-seven cards were valid. At no time during the earlier stages of the proceedings, or thereafter, did the Company assert a doubt as to the selection of the Union by a majority of its employees as their bargaining representative. The Company asserts no objective facts or subjective belief warranting rejection of the cards on the basis of a good faith doubt.

On October 27, 1967, the case of N. L. R. B. v. S. S. Logan Packing Company, 386 F.2d 562, was decided and this court there declined to enforce a Board order requiring the company to bargain with the union which was seeking to obtain recognition by means other than an election, i. e., on the sole basis of signed union cards. We there pointed out, for certain assigned reasons, "a card check is not a reliable indication of the employees' wishes." However, in *Logan*, the course of conduct of the company, following the union's demand for recognition, evidenced the company's good faith doubt of the union's claim that it represented a majority of the employees. There was no evidentiary basis for a rejection of the employer's assertion of doubt as to the union's claim. The company filed a formal charge of coercive practices by the union in the use of threats to obtain signatures to authorization cards but the Regional Director refused to issue a complaint. On the other hand, a complaint issued on union charges of violations of section 8(a) (1) and (5) of the Act. We accepted in *Logan* the Board's finding of coercive questioning and surveillance of employees after the union's demand for bargaining; but we reached the conclusion that all of the specifics in the record tended to enhance, rather than diminish, the company's doubt of the union's claim and that if the company had any information tending to support the union's claim the record failed to disclose it. We refused to enforce the Board's order requiring the company to bargain with the union and rejected the finding that the company had refused to bargain in violation of the Act. However, we did recognize that the employer's duty to bargain follows actual recognition of union representation or under circumstances where recognition is wrongfully withheld when the union clearly represents a majority of the employees and the employer has no doubt of it. In short, on the facts in *Logan*, we concluded that there was no duty on the company to recognize the union or to bargain with it.

In the instant case there was ample evidence upon the whole record to support the Board's determination that shortly

after the receipt of the Union's letter demanding recognition and requesting a bargaining session the Company began a concerted drive calculated to discourage employees from voting for the Union in the upcoming election. The success of the effort is evidenced by the results of the election, the Union receiving only six votes. There was evidence to support the Board's finding of violations of section 8 (a), (1), (3), and (4) of the Act.

There was nothing to indicate any doubt whatever by the Company that the Union had been selected by a majority of the employees as their representative. The employer is forbidden by pertinent law to interfere with the employees' right to exercise a free and untrammeled choice of a bargaining representative through the election process. Under the facts and circumstances here, as distinguished from those in *Logan*, I concur.