**CHARGE CARD ASSOCIATION,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 80–1126.

United States Court of Appeals,
Sixth Circuit.

July 7, 1981.

Donald E. Barris, Eugene Driker, Barris, Sott, Denn & Driker, Elaine Fieldman, Stephen E. Glazek, Detroit, Mich., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Joseph A. Schwachter, N. L. R. B., Washington, D. C., for respondent.

Before ENGEL and MERRITT, Circuit Judges, and PORTER, Senior District Judge.*

## ORDER

Petitioner, Charge Card Association, seeks review and respondent enforcement of the National Labor Relations Board order finding of violations of § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1).

Charge Card Association provides retail customer credit checking, billing and related services to its member banks. This case centers around the employees of the keypunch department. In the summer and fall of 1977, Local 10 of the Office and Professional Employees International Union conducted an organizing campaign at Charge Card. In late November or early December of 1977, keypunch department supervisor Mary Litwin gathered four small groups of

employees in her office to discuss the Union campaign. The meeting lasted about fifteen minutes, during which Litwin gave the employees a three page document by the Association president to read. The Administrative Law Judge found that "Litwin asked why the employees felt that they needed a union; gave the employees reasons why she felt they did not need a union and named the benefits that the employees had with the Respondent." (A. 447). In October of 1977 Patricia Walker, the afternoon supervisor in the keypunch department, met with employee Sandra J. Clark, with whom she was friendly. The Administrative Law Judge found that "Walker attempted to 'diagram' for Sandra J. [Clark] how the Respondent 'would fold if the Union came in,' by showing 'how the banks would eventually pull out one by one'." (A. 448). Three weeks later Walker called Clark at home and offered to trade information, but Clark refused to exchange information. The Administrative Law Judge specifically credited Clark and discredited Walker's denial that she had conversed with Clark concerning unions. The Administrative Law Judge concluded that the actions of the two supervisors put pressure on employees to reveal information concerning protected activities, in violation of § 8(a)(1) of the Act.

It is not a violation of the National Labor Relations Act for an employer to express views, argument or opinion concerning unionization, or to solicit information from employees, as long as the expression does not coerce or interfere with the employees in exercising their rights. 29 U.S.C. § 158(c); *N. L. R. B. v. Paschall Truck Lines, Inc.*, 469 F.2d 74, 76 (6th Cir. 1972); *Hughes & Hatcher, Inc. v. N. L. R. B.*, 393 F.2d 557 (6th Cir. 1968). It is questionable whether the acts of supervisor Litwin in reading the Association statement and asking employees why they felt they needed a union constitute coercive interrogation in violation of the Act. It is evident,

* The Honorable David S. Porter, Senior Judge, United States District Court for the Southern District of Ohio, sitting by designation.

however, that supervisor Walker's statement that the Association "would fold if the Union came in" was a violation of the Act. *N. L. R. B. v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969) (predictions of effect of unionization must be based on objective fact to convey employer's belief as to demonstrable probable consequences beyond his control). Enforcement of the NLRB order is granted as to this charge.

The remaining charges stem from acts that occurred after the attempt to formally organize was abandoned. The Union voluntarily withdrew its representation petition in December of 1977. There continued to be dissatisfaction in the keypunch department, and on Monday, January 9, 1978, thirteen of the nineteen department employees sought to present their grievances as a group to the Association president, who was out of town. In lieu of a group meeting, vice president Nagy met with the individual employees throughout the day. Nagy was aware that some of the employees appeared dissatisfied with the results of the meetings. The following day at least ten keypunch department employees called in sick. Day shift supervisor Litwin reported the abnormally high absences to personnel director Collins. Collins had the absent employees notified that they would not be permitted to return to work unless they presented a doctor's certificate attesting illness. The personnel manual states that the supervisor "may require written verification for any sick day taken, particularly where there is a history of excessive absenteeism." (A. 456). The Administrative Law Judge credited testimony, however, that it was the employer's practice to not require a certificate for absences less than five days unless the absence was near a holiday or there was a record of excessive absenteeism (A. 456–57).

When the keypunch employees returned to work the following day without a doctor's certificate they were not permitted to work and were ordered off the employer's premises. They were excluded the following day as well. That day they sent a letter to vice president Nagy stating that they had "staged a work stoppage in protest" and that they were "unconditionally ready to return to work" with the understanding that they would receive a deduction in pay for the one-day work stoppage (A. 451). The employees continued to report to work but were refused admission. On January 23d and 24th, personnel director Collins met with each employee and gave each a letter informing them that "[b]ecause of your actions, you have been suspended without pay" and that an adjustment in pay would be made for the day that they received sick pay. They were allowed to return to work "on a 180 day probationary status" during which "any unexcused absenteeism or tardiness . . . or any other disruption, insubordination or poor performance will result in the immediate termination of your employment." (A. 452). Each employee was asked to sign the letter but was not required to do so. The Administrative Law Judge credited testimony that during the meeting personnel director Collins expressed concern that the employees' actions "disrupted the Company" and that the purpose of the probation was to make sure that something like the action of the employees "didn't happen again." (A. 452). Four of the employees who participated in the work stoppage never returned to work. All other employees, except Sandra J. Clark, who was ill, returned to work. Three weeks after they returned to work each of the six employees involved in the work stoppage received a disciplinary letter from personnel director Collins. On April 11th three employees received additional disciplinary letters stating that they had violated the terms of the probation and that any further unexcused tardiness or absence would result in a five-day suspension without pay. Employee Sandra J. Clark was later suspended for five days when she failed to present a doctor's certificate for the full time of her absence (*See* A. 458–59).

The Administrative Law Judge concluded that the refusal to allow keypunch employees to return to work after the one-day work stoppage and the subsequent probation were violations of the Act. He also

concluded that the suspension of Sandra J. Clark was unlawful. The Administrative Law Judge ordered the employer, among other things, to offer reinstatement to the employees.

 A walkout of unorganized employees is a protected activity under the Act, *Vic Tanny International, Inc. v. N. L. R. B.*, 622 F.2d 237 (6th Cir. 1980); *cf. N. L. R. B. v. Washington Aluminum Co.*, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962) (non-union employees did not lose right to engage in concerted activity merely because they did not present demand to employer prior to walkout), and an employer may not discipline or discharge an employee for engaging in protected activity. An employer, however, may discipline or discharge if such discipline would have been imposed even absent the protected activity. 29 U.S.C. § 160(c). The proper test for evaluating mixed-motive cases is whether punishment of protected activity or anti-union animus was a dominant motive in the employer's actions. The burden has been placed on the general counsel to demonstrate that absent protected activities the suspension or discharge would not have taken place. *Propak Corp. v. N. L. R. B.*, 578 F.2d 169 (6th Cir. 1978). In *Wright Line*, 251 NLRB No. 150, 105 LRRM 1169 (1980), the Board determined that the General Counsel must make a prima facie showing that an illegal purpose was a "motivating factor" in the employer's decision. Once the prima facie case has been established the burden shifts to the employer to demonstrate that the same action would have been taken in the absence of the illegal motivation or factor. Under either the dominant motive test or the shifting burden as established in *Wright Line*, we conclude that there is not substantial evidence to support the conclusion that the reason for disciplining the employees was to punish them for engaging in a protected walk-out. The Administrative Law Judge agreed that it was an "admittedly unusual occurrence" to have more than half of the keypunch department call in sick on the same day. Charge Card, as an employer, "has the right to demand that its employees be honest and truthful in every facet of their employment." *N. L. R. B. v. Mueller Brass Co.*, 509 F.2d 704, 713 (5th Cir. 1975). The fact that the employees falsely claimed to be sick in the course of engaging in protected activities does not insulate them from suspension for abusing their sick time. This Court cannot excuse lying even if in the context of protected activity. When the false calling in sick is viewed as an improper activity for which the employer may rightly suspend employees, it becomes apparent that substantial evidence supports a conclusion that lying was the dominant motive for the suspension. *N. L. R. B. v. Howell Automatic Machine Co.*, 454 F.2d 1077, 1083 (6th Cir. 1972) (court need not accept inference colored by improper view of rights and duties of parties). Had the employees truthfully announced that they were withholding their services for one day in protest of the work conditions, the suspensions would have clearly been improper. As it was, the employees called in sick. In light of the unusually high absenteeism that day, it was not unreasonable for the employer to demand that the employees support their assertion of illness. This is true even if Charge Card suspected that the employees were in fact protesting work conditions. Just as employees cannot express dissatisfaction with work conditions by physically abusing their supervisors, employees cannot express their dissatisfaction with work conditions by lying.

 Because the employer did not improperly place the employees on probation, the subsequent acts, including the suspension of Sandra J. Clark, were also not in violation of the Act.

Enforcement is granted with respect to paragraphs 1(a)–(c) and 1(e) of the NLRB order and denied with respect to the remainder of the order. Paragraph 2(g) is enforced to the extent consistent with the enforcement granted herein.