GRAHAM ARCHITECTURAL PRODUCTS CORPORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 82–3063.

United States Court of Appeals, Third Circuit.

Argued Sept. 15, 1982.

Decided Jan. 10, 1983.

Rehearing and Rehearing En Banc Denied March 31, 1983.

Lawrence T. Zimmerman, Alan D. Cirker (argued), Zimmerman & Obadal, Washington, D.C., for petitioner.

Paul J. Spielberg, Deputy Asst. Gen. Counsel (argued), Morton Namrow, Atty., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L. R.B., Washington, D.C., for respondent.

1. The Union is District Lodge 98, International Association of Machinists and Aerospace Workers, AFL–CIO.

Before SEITZ, Chief Judge, and GARTH and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

The National Labor Relations Board ("the Board") found that Graham Architectural Products Corporation ("Graham" or "the Company") committed six unfair labor practices violating section 8(a)(1) of the National Labor Relations Act ("the Act") by its conduct during a union organizing campaign. The violations involved questioning of employees by company officials and, on one occasion, interfering with an employee's right to distribute union literature on company property. The Board found that these practices infected the representation election among Graham employees, which the Union [1] lost, and ordered a rerun election. On appeal, Graham seeks review of the Board's orders and the Board has cross-petitioned for enforcement. We conclude, as did the Administrative Law Judge ("ALJ"), that the record establishes unfair labor practices involving only two employees; we will enforce that part of the Board's cease and desist order which is predicated on those findings. As to the Board's order directing a new election, it is interlocutory and we are therefore without jurisdiction to review it at this time.

### I.

Graham manufactures aluminum replacement windows at a plant in York, Pennsylvania. In the spring of 1979, the Union commenced an organizing campaign among Graham's employees, and on May 7, filed an election petition seeking to represent Graham's production and maintenance employees. The Union and the Company signed, and the Board approved, a Stipulation for Certification upon Consent Election setting the election for July 20, 1979. Four days

before the election, on July 16, the Union filed unfair labor practice charges against Graham with the Board. In the election, the Union lost its bid to represent the Graham employees by a vote of 93 to 68 with 7 ballots challenged. The Union filed timely objections to the election and filed additional unfair labor practice charges on July 31. Because the unfair labor practice charges and objections to the election were based on common issues, the two cases were consolidated for hearing before an ALJ.

In a decision filed February 13, 1981, the ALJ found company unfair labor practices involving coercive interrogations of two employees, Reisinger and Oberdick, about their feelings toward the Union. The ALJ recommended dismissal of all remaining charges, and further, concluded that the unfair labor practices did not warrant invalidating the election results. The Board, however, found four additional unfair labor practices arising out of other instances of interrogation and one instance of interfering with the distribution of union literature and rejected the ALJ's recommendations for dismissal of charges relating to these incidents. The Board also concluded, contrary to the ALJ's recommendation, that a rerun election was necessary. *See* 259 N.L. R.B. No. 153.

## II.

■ We begin our analysis by noting the principles that define the scope of our review of the Board's order. The Board's factual findings must be affirmed if they are supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e). *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Yet this does not relieve us of the responsibility to scrutinize the Board's findings to ensure that national labor policies are implemented. *See NLRB v. K & K Gourmet Meats, Inc.,* 640 F.2d 460, 463 (3d Cir.1981). Although we are not permitted to substitute our view for any reasonable conclusion by the Board, "a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial." *Universal Camera, supra,* 340 U.S. at 488, 71 S.Ct. at 464. Finally, the courts bear the ultimate responsibility to decide and enforce the applicable legal standard. *Cf. Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 182, 92 S.Ct. 383, 399, 30 L.Ed.2d 341 (1971) (question of what is a mandatory subject of bargaining).

### A.

■ Several cases, both within this circuit and elsewhere, have considered the circumstances under which employee questioning during a union organizational campaign will violate section 8(a)(1) of the Act.[2] It is well established that it is not necessarily improper for an employer to inquire into an employee's sentiments toward the union. *See, e.g., K & K Gourmet Meats, supra,* 640 F.2d at 465.[3] What section 8(a)(1) of the Act proscribes is interrogation tending to restrain or coerce the employees in the exercise of their right to organize. An employer's questioning becomes coercive and runs afoul of section 8(a)(1) when it "suggests to the employees that the employer may take action against them because of their pro-Union sympathies." *Frito-Lay, Inc. v. NLRB,* 585 F.2d 62, 65 (3d Cir.1978). *See K & K Gourmet Meats, supra,* 640 F.2d at 465; *Hedstrom Co. v. NLRB,* 629 F.2d 305, 314 (3d Cir.1980) (in banc), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981). Although the Board need not show that the employer's interrogation actually

---

**2.** Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1976), makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their rights, inter alia, to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection.

**3.** *See also NLRB v. Hasbro Indus., Inc.,* 672 F.2d 978, 985 (1st Cir.1982); *Pioneer Natural Gas Co. v. NLRB,* 662 F.2d 408, 415 (5th Cir. 1981); *Charge-Card Ass'n v. NLRB,* 653 F.2d 272, 273 (6th Cir.1981); *Midwest Stock Exch., Inc. v. NLRB,* 635 F.2d 1255, 1267 (7th Cir. 1980); *Burns Elec. Security Serv., Inc. v. NLRB,* 624 F.2d 403, 411 (2d Cir.1980).

had any coercive effect, the questioning must reasonably have tended to coerce under the circumstances. *See K & K Gourmet Meats, supra,* 640 F.2d at 465; *Hedstrom, supra,* 629 F.2d at 314; *NLRB v. Armcor Industries, Inc.,* 535 F.2d 239, 242 (3d Cir. 1976). Our task, then, is to determine whether substantial evidence supports the Board's finding that the various incidents of questioning of Graham employees were coercive in character.

### DAVID REISINGER

Employee Reisinger testified before the ALJ that on July 9 shortly after lunch supervisor Michael Lehr called him to Lehr's office. Reisinger met Lehr at the timeclock as he was on his way to Lehr's office. Lehr asked Reisinger several questions concerning Reisinger's activities during the preceding lunch hour, and Reisinger replied truthfully that he had been to the union hall. Lehr responded, "Yes, I know you were at the union hall." Lehr demanded to see the union literature Reisinger had obtained, but Reisinger refused to show Lehr the materials. The conversation continued for 15 to 20 minutes and covered a variety of subjects. Reisinger testified that he and Lehr were personal friends and often played basketball together at lunchtime.

■ Several aspects of this incident lead us to agree with the Board's finding that supervisor Lehr's questioning of employee Reisinger was unlawful. The inquiries were not part of an ordinary casual conversation; rather, Lehr specifically requested Reisinger to come to his office. Lehr indicated that he had prior knowledge of Reisinger's lunchtime visit to the union hall, implying that Reisinger's activities were under the Company's surveillance. Lehr demanded to see the materials Reisinger had picked up. Together, the circumstances created a risk from which Reisinger could reasonably conclude that if he engaged in further pro-union activities the Company might retaliate. Although Lehr's and Reisinger's friendship and the occurrence of the conversation in an open plant area tend to negate a coercive influence, considering all the evidence, including the peremptory demand for the union materials, the Board had a reasonable basis to find the interrogation coercive.

### DIANA OBERDICK

Employee Oberdick testified to two conversations she had with her supervisor, Robert Reichard. Some time in early July, Reichard stopped by Oberdick's work station and asked her if she knew "how the Union got started" in the plant. She answered that she did not know, and Reichard remarked that the Union would not help. The conversation then turned to other matters and lasted approximately 15 to 20 minutes. Later, on July 10, Reichard asked Oberdick to step outside the building to talk. Once outside, Reichard asked her how she was getting along with another supervisor, and they briefly discussed some personal matters of Oberdick that they had discussed on previous occasions. Reichard then asked Oberdick for her opinion about the "union situation." Oberdick replied that she felt mistreated by the Company and she would support the Union if it won the election, although it did not really matter to her. Oberdick testified that this conversation lasted 30 minutes and ran over into her lunch period. Like Reisinger, Oberdick testified that she was quite friendly with her supervisor, Reichard, and that she talked with him almost every day. She noted that Reichard once had spoken to her at length to dissuade her from quitting her job with the Company.

■ The conclusion of the ALJ, affirmed by the Board, that Oberdick was coercively interrogated by her supervisor Reichard is supported by substantial evidence. On two occasions, Reichard initiated conversation in which he asked Oberdick questions about the Union. During the first conversation, he approached her at her work station and asked if she knew how the Union had gotten started in the plant. This was not a casual inquiry into a co-worker's feelings, but a request from which a reasonable inference can be drawn that it was aimed at

securing specific information concerning the genesis of the union campaign and the identity of the leaders. It was not unreasonable for the Board to conclude that under these circumstances Reichard's question may have conveyed to Oberdick the message that the Company was contemplating retaliation against the union activists who were responsible for the organizing campaign. Oberdick's testimony that Reichard again brought up the subject of the Union a few days later, after first asking her to leave her work post and step outside to talk, provides some additional evidence, albeit slight, to support the ALJ's finding of coercion. Although Oberdick testified that she and Reichard were friends, the Board was entitled to conclude that the questioning had a coercive character despite their friendship.

■ As for the other instances of interrogation which were held to violate section 8(a)(1), however, we believe that the Board has cast its net too far. It has summarily found coercive activity without evidence in the record to support such a finding. We cannot affirm the Board's findings that the questioning of employees Stambaugh, Shaeffer, and Jones was unlawful. We believe the ALJ who heard the testimony correctly concluded that the circumstances surrounding those incidents do not demonstrate the necessary element of intimidation or coercion. The ALJ obviously was in a better position than the Board to determine the character of the interrogation, and his findings must be considered in deciding whether the Board's conclusions are supported by substantial evidence. *Universal Camera, supra,* 340 U.S. at 496, 71 S.Ct. at 468; *K & K Gourmet Meats, supra,* 640 F.2d at 466.

## DARLENE STAMBAUGH

Employee Stambaugh testified that on July 13, Greg Nash, her supervisor, called her over to his desk and asked her whether she was for the Union. Stambaugh replied that she did not have to tell him, and Nash readily agreed that she did not. Stambaugh then said she was "not ashamed" and stated that she intended to vote for the Union. Stambaugh and Nash continued to discuss generally the advantages and disadvantages of the Union for about one and one-half hours. Stambaugh testified that she was an active supporter of the Union during the organizational campaign, wearing a union button and openly distributing union literature at her work area in plain sight of Nash and other supervisors.

■ We are unable to perceive substantial evidence to support the Board's conclusion that this conversation between Stambaugh and supervisor Nash on July 13, the Friday immediately preceding the election, was coercive and violated section 8(a)(1). The question itself contained no veiled threat or implication that the Company contemplated reprisals against union supporters.[4] And we fail to see how the circumstances here made Nash's inquiry coercive. Although Nash did call Stambaugh to his desk, this has little significance here because Nash's desk was located in an open area near Stambaugh's work station, not in a formal office. As Nash apparently was a low-level supervisor, it would not have been unusual for him to have in-plant conversations with the employees. We also note that the question led to a 90-minute conversation during which nothing improper was said. Moreover, it is important to bear in mind that there was no history of Company hostility to the Union. *See Lutheran Hos-*

---

4. In *Hedstrom Co. v. NLRB,* 629 F.2d 305, 314–15 (3d Cir.1980) (in banc), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981), this court viewed the supervisor's lack of assurances against reprisals and the lack of any valid reason for the inquiry as two factors indicative of coercion. Although these factors are also present here, they are outweighed by other circumstances indicating that the statement did not tend to restrain the employee.

The inquiries in *Hedstrom* were made in an environment of serious unfair labor practices by the company. There was no such background behind the inquiry of Stambaugh. *See Delco-Remy Div., General Motors Corp. v. NLRB,* 596 F.2d 1295, 1311 (5th Cir.1979) (assurance of no reprisals unnecessary where it is apparent the interrogation is for an innocent purpose and the questions convey no veiled threat of reprisal).

*pital of Milwaukee, Inc. v. NLRB,* 564 F.2d 208, 210–11 (7th Cir.1977), *vacated and remanded on other grounds,* 438 U.S. 902, 98 S.Ct. 3118, 57 L.Ed.2d 1145 (1978). This inquiry was not part of a full scale "antiunion campaign orchestrated by the highest levels of . . . management," as was the case in *Ethyl Corp.,* 231 N.L.R.B. 431, 433 (1977). Most important, by agreeing with Stambaugh that she did not have to answer the question, Nash effectively withdrew the question and removed any pressure on Stambaugh to respond.[5]

## SONIA SHAEFFER

A few days before the election, employee Shaeffer had a discussion with Michael McArthur, a company official, concerning personal matters. During the course of this conversation, McArthur asked Shaeffer what she thought the Union could get for her, and Shaeffer, who was wearing a union button, replied, "More money and some better benefits." They continued for a few minutes to discuss different wage rates, the cost of living, and the unavailability of unemployment benefits to striking employees. Shaeffer testified that she and McArthur were friends, and that she openly engaged in various union activities.

■ The ALJ had difficulty characterizing McArthur's question as an "interrogation." Even if it were, he found that it was not coercive because it "occurred in the context of a personal discussion" about McArthur's baby and the national economy. We agree. McArthur's question is not inherently threatening or intimidating, and was asked in the course of a casual conversation that Shaeffer herself initiated. McArthur was not Shaeffer's supervisor and did not even work on the same shift with her. Moreover, because Shaeffer was openly active on behalf of the Union, there is no reason to think that McArthur was trying to discover her personal views. As the ALJ observed, the circumstances of the conversation do not suggest any element of coercion or possibility of reprisal.

## ROSA JONES

The final instance of purported unlawful interrogation occurred on July 18, when employee Jones was approached at her work station by her supervisor, Art Danfelt, who asked her how she felt about the Union. According to Jones' testimony, she told Danfelt that she did not want to talk about it, and Danfelt assured her that nothing would happen to her if she did talk. Jones said that she thought the Union was "all right." Danfelt left the area looking upset, returning a few minutes later to ask Jones if she thought the Union could get her more money. She answered that she did not know, and Danfelt observed that it was by no means certain that it could.

■ We fail to discern a coercive element in the interrogation of employee Jones by her supervisor Danfelt. Even assuming that the casual inquiry into Jones' feelings about the Union can be described as "interrogation," the circumstances surrounding the questioning simply do not spell coercive activity. The discussion took place at Jones' work station. Again, Danfelt was not a high official in the Company. He conveyed no direct or implied threat or warning to Jones, nor was the question asked in the context of unlawful threats to other employees.[6] Danfelt's assurances that nothing would happen to Jones if she revealed her feelings about the Union removed whatever minimal coercive influence the question might have had. Although

---

5. We believe the rationale of *J.K. Electronics, Inc. d/b/a Wesco Elec. Co.,* 232 N.L.R.B. 479, 482 (1977) applies to this case. In *Wesco,* the Board found no violation of the Act because the supervisor withdrew the question into the employee's union sentiments before the employee could answer. In the instant case, the Board distinguished *Wesco* on the ground that Nash "did not withdraw his question but simply conceded, when challenged, that Stambaugh was correct in saying she did not have to answer." We fail to appreciate the significance to this distinction. The important point is that Nash clearly communicated to Stambaugh that she need not respond to the inquiry.

6. *See Midwest Stock Exch., Inc. v. NLRB,* 635 F.2d 1255, 1268 (7th Cir.1980).

Jones testified that she later learned that Danfelt made similar inquiries to other employees, we agree with the ALJ that the necessary element of coercion is lacking.[7]

In deciding whether questioning in individual cases amounts to the type of coercive interrogation that section 8(a)(1) proscribes, one must remember two general points. Because production supervisors and employees often work closely together, one can expect that during the course of the workday they will discuss a range of subjects of mutual interest, including ongoing unionization efforts. To hold that any instance of casual questioning concerning union sympathies violates the Act ignores the realities of the workplace. Moreover, as the United States Supreme Court recognized in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the First Amendment permits employers to communicate with their employees concerning an ongoing union organizing campaign "so long as the communications do not contain a threat of reprisal or force or promise of benefit." *Id.* at 618, 89 S.Ct. at 1942. This right is recognized in section 8(c) of the Act. If section 8(a)(1) of the Act deprived the employers of any right to ask non-coercive questions of their employees during such a campaign, the Act would directly collide with the Constitution. What the Act proscribes is only those instances of true "interrogation" which tend to interfere with the employees' right to organize. The Board has gone much further here.[8]

### B.

The Union also charged the Company with attempting to interfere with the distribution of union literature. Employee Jill Strayer testified that on July 18, shortly before her shift was due to start, she was handing out literature in the company park-

ing lot. According to Strayer's testimony, when Michael Lehr drove into the parking lot, he approached her and told her to "get the hell off" the parking lot and that she was not allowed "to hand junk out on company property." Strayer answered that she had a right to distribute the literature, and Lehr told her to move to the railroad tracks near the plant entrance. Strayer complied with this instruction, and resumed her distribution of handbills to employees reporting for work at the plant entrance. The ALJ found that from the railroad tracks near the plant entrance Strayer actually was able to communicate with more employees than she could have from her position in the parking lot. When her shift commenced, she entered the plant and there distributed a few more leaflets to employees.

The Board held that Graham violated the Act by its attempt to interfere with the distribution of union literature by Strayer. The ALJ had recommended dismissal of this allegation, reasoning that by merely requiring Strayer to move to another location, the Company had not hindered her distribution of handbills to employees. The Board, in a conclusory fashion, stated that "employees have the right to solicit union support by handbilling during nonworktime while on their employer's premises, and a violation of this right is not cured by the fact that an employer did not prohibit distribution on other occasions."

Undoubtedly, employees have the right to distribute union literature in nonworking areas of the employer's premises during nonwork periods. Employers may not interfere with this right except to the extent necessary to maintain production or discipline. *See Eastex, Inc. v. NLRB,* 437 U.S. 556, 570–72, 98 S.Ct. 2505, 2514–

---

7. In rejecting the ALJ's findings, the Board stated that "an inquiry into an employee's views toward a union, even in the context of assurances against reprisals, reasonably tends to interfere with the free exercise of an employee's Section 7 rights." To the extent this suggests the Board's position is that an inquiry into an employee's views is per se coercion and a showing of coerciveness is not required, we

specifically held otherwise in *K & K Gourmet Meats, supra.*

8. Regrettably, the conclusory nature of the Board's opinion in this case makes it especially difficult for us to ascertain the basis for the Board's findings that the inquiries to Stambaugh, Jones, and Shaeffer were coercive.

2515, 57 L.Ed.2d 428 (1978); *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 801–05, 65 S.Ct. 982, 987–988, 89 L.Ed. 1372 (1945). The Board assumed, however, that Lehr's conduct constituted unlawful interference. By requiring Strayer to move, the Company in no way made it more difficult for her to distribute handbills to those employees she sought to communicate with in the parking lot. At the plant entrance, she was able to reach all these employees, plus others. Furthermore, other witnesses testified that they freely distributed union literature in the plant and solicited employees without any interference by the Company. We believe that under such circumstances no unlawful interference occurred.

The Board apparently takes the position that Strayer had a right to distribute literature wherever she pleased, and that any conduct by the Company intruding upon her choice of location is an interference which constitutes an unfair labor practice. We do not agree. The Tenth Circuit has refused to find a section 8(a)(1) violation where the incident of alleged interference with the distribution of literature was trivial and isolated. *See NLRB v. First National Bank of Pueblo,* 623 F.2d 686, 692 (10th Cir.1980).[9] The Board has reached the same result in one of its own cases on the ground that

there was "no evidence that any employee was effectively precluded from engaging in lawful solicitation activity." *See Phillips Industrial Components, Inc.,* 216 N.L.R.B. 885, 885 (1975).[10] We believe a similar rationale applies here. The consequence of Lehr's instruction to move elsewhere merely caused Strayer the momentary inconvenience (five minutes) in moving to another nearby but more effective location. This negligible burden on her right to handbill was surely outweighed by the advantage of the plant entrance for reaching a maximum number of employees. Furthermore, there was no evidence that Strayer or any other employee was intimidated by the incident.[11] Under these circumstances, the slight interference was innocuous and did not rise to the level of a violation of the Act. We therefore will not enforce the Board's order with respect to this charge.

### III.

Although the ALJ concluded that the coercive interrogation involving two employees "[was] isolated and [too] minimal to warrant invalidating the election," the Board thought, in view of its finding that there were other unfair labor practices, that a new election should be conducted among Graham's employees and so ordered. The

9. In *First National Bank of Pueblo,* two high officials of the Company approached a union representative who was distributing union literature on the public street and confiscated a handbill. The court agreed with the ALJ that this was a "petty, momentary squabble" and rejected the Board's conclusion that the incident constituted unlawful interference. The court noted "there was no showing that the incident precluded [the union] from distributing leaflets to all employees." 623 F.2d at 692. Although counsel for the Board attempts to distinguish *First National Bank of Pueblo* from this case on the ground that the disputed incident in *Pueblo* occurred on public property, not on the employer's premises, this actually makes the present case stronger for the employer.

10. In *Phillips,* a supervisor attempted to prevent an employee from lawfully soliciting signatures on union authorization cards. When the employee protested that he was entitled to solicit during non-work periods, the supervisor instructed him to "cease and desist" until the supervisor could consult with higher manage-

ment. A short time later, the employee was told that he could resume his solicitation of authorization cards during nonworking time. The Board found no violation of section 8(a)(1), observing that the initial blanket no-solicitation order was effectively cured by the retraction of that order a few hours later, and that pro-union employees solicited openly and without interference throughout the entire union campaign. 216 N.L.R.B. at 885.

11. In its brief, counsel for the Board suggests that Lehr's conduct might have had a chilling effect on Strayer's willingness to distribute union literature "since she had reason to fear that Lehr's interference might be repeated if she tried again—perhaps with more serious disciplinary consequences." In view of the evidence that Strayer proceeded to distribute literature at the company entrance and that she and other employees freely distributed handbills without interference on numerous occasions, the General Counsel's contention is baseless speculation.

Company also has appealed from this order. We conclude that we may not review the Board's order of a new election because it is not a final order under § 160 of the Act and therefore is not appealable at this time. This denial of review is without prejudice to the Company's right to challenge the Board's set-aside order in future proceedings relating to a second election.[12]

The situation here, of course, is somewhat different from the ordinary case, because the facts underlying the Board's election order have already been considered by this court in reviewing the unfair labor practice findings. Therefore, considerations of efficiency and judicial economy seem to suggest that we review the election order as well. But we are powerless to do so because of the statutory restriction on our jurisdiction. We therefore agree with those circuits that, although reversing the Board on unfair labor practice determinations, have declined to review Board election orders issued in a consolidated proceeding and involving common facts.[13]  *See NLRB v. Intertherm, Inc.,* 596 F.2d 267, 278 (8th Cir. 1979); *NLRB v. Monroe Tube Co.,* 545 F.2d 1320, 1329 (2d Cir.1976); *American Bread Co. v. NLRB,* 411 F.2d 147, 156 (6th Cir. 1969). *See also Hendrix Mfg. Co. v. NLRB,* 321 F.2d 100, 106 (5th Cir.1963).[14]

### IV.

In reviewing the Board's cease and desist order in this case, we conclude that only two unfair labor practices were committed. They involved only two employees out of a unit of approximately 180 eligible voters. There is no evidence that their interrogation contaminated the rest of the bargaining unit. Under such circumstances, and in light of our decision, the Board may wish to give further consideration to whether a rerun election is required.

We affirm the Board's findings that the Company violated section 8(a)(1) of the Act by its coercive interrogation of employees Diana Oberdick and David Reisinger. We enforce the Board's order requiring the Company to cease and desist from unlawful conduct and to post proper notices only insofar as it is based on these violations. The Company's petition to vacate the order directing a new election will be dismissed without prejudice for want of an appealable order. Each side to bear its own costs.

GARTH, Circuit Judge, dissenting:

The majority opinion correctly concludes that four of the six unfair labor practices found by the Board were unsupported by the record. It also correctly holds that there is no evidence that the two unfair labor practices that were supported by evidence in the record contaminated the rest of the bargaining unit. To this point I am in complete agreement with the majority's analysis and conclusions.

I do not join the majority opinion, however, because the majority, while recognizing that the predicate for the Board's order of a new election (the unfair labor practices which we now hold have no support in the record) has now disappeared, nevertheless

---

**12.** An employer aggrieved by the Board's decision in a representation case may obtain judicial review only through a somewhat circuitous route. An order of the Board directing an election is not considered a final order and therefore is not appealable. *NLRB v. International Brotherhood of Electrical Workers,* 308 U.S. 413, 60 S.Ct. 306, 84 L.Ed. 354 (1940). Should the Union here win the rerun election and be certified as the bargaining representative of the employees, the Company may challenge the election order before the Board and refuse to bargain with the Union. If the Board finds that the Company has committed an unfair labor practice by refusing to bargain, the employer may then appeal this determination and can at that time raise any objections to the rerun election order. *See Boire v. Greyhound Corp.,* 376 U.S. 473, 477, 84 S.Ct. 894, 896, 11 L.Ed.2d 849 (1964).

**13.** The same position is taken by a prominent commentator. *See* D. Leslie, Cases and Materials on Labor Law 103 (1979).

**14.** To the extent that the Ninth Circuit held otherwise in *NLRB v. General Telephone Directory Co.,* 602 F.2d 912, 920 (9th Cir.1979), we decline to follow that case. Moreover, we note that *General Telephone* is of questionable authority in light of that circuit's later statement in *NLRB v. Marine World USA,* 611 F.2d 1274, 1276 n. 3 (9th Cir.1980).

refuses to set aside the Board's order setting aside the July 20, 1979 election and ordering a second election. It declines to do so on the ground that we have no jurisdiction over this part of the Board's order, as it is not a "final order" and therefore may not be reviewed.

It is from this latter holding that I must respectfully dissent. In my opinion, neither the National Labor Relations Act, nor the authorities interpreting that Act, establish that a Court of Appeals has no jurisdiction in a situation such as this one. Indeed, logic, policy, prudential and jurisprudential considerations dictate otherwise. Therefore, while I subscribe to all of the majority's opinion with respect to the unfair labor practices and its holding that the bargaining unit was not contaminated, I am obliged to dissent from so much of the majority opinion as refuses to review (and then reverse) the Board's determination that a second and unnecessary election must be held.

## I.

The election in this case which was held on July 20, 1979, resulted in a vote as follows:

93 votes against the union;

68 votes for the union;

7 challenged ballots.

App. 27, 220.

The union claimed that the company had engaged in various unfair labor practices, and that these violations invalidated the election. The Administrative Law Judge did not agree. He found that "the Respondent engaged in coercive interrogation, in three instances, involving two employees. I conclude that they were isolated and two' [sic] minimal to warrant invalidating the election..." App. 27.

The Board, on the other hand, concluded that three additional instances of coercive interrogation and one instance of interference with handbilling had occurred and, without any explanation and without substantial evidence, concluded that this increased number of violations had tainted the entire election. App. 9. The Board thus determined that the July 20, 1979 election had to be set aside and a new election ordered.

This court has now unanimously concluded that none of the additional unfair labor practices which the Board found are supported by the record. Thus, the entire foundation for the Board's determination that the July 20th election was tainted and must therefore be invalidated, has now been removed. As the record now stands, the underpinning for the Board's order of a new election no longer exists. Yet it is argued that, despite this circumstance, we may not review the Board's order which requires a new election—even though the original election held on July 20, 1979 is free from contamination, is therefore valid, and no reason exists not to give it effect.

I cannot agree.

## II.

As I read the provisions of the National Labor Relations Act (particularly those pertaining to review), they do not, by their terms, expressly grant or withhold Court of Appeals jurisdiction over a Board order for a *second* election. Indeed, they do not even address this subject, any more than they expressly address Court of Appeals jurisdiction to review an order which directs, or results from, an initial representation election.[1] However, it has been made clear that the Act's review mechanism precludes review of an order directing an initial representation election until after the Board has ordered the employer to take particular actions predicated upon the results of that election and the employer has refused.[2] This procedure has been summarized by one commentator as:

---

1. *See* 29 U.S.C. §§ 159(d) and 160(f).

2. *See, e.g.,* 79 Cong.Rec., 7658; Sen.Rep. No. 573, Committee on Education and Labor, 74th Cong., 1st Sess. 14; House Rep. No. 1147, Committee on Labor, 74th Cong., 1st Sess. 23;

*American Federation of Labor v. NLRB,* 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940); *NLRB v. Falk Corp.,* 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396 (1940).

Section 10(f) [29 U.S.C. § 160(f) ] of the NLRA permits a "person aggrieved by a final order of the Board" to petition for review of the order in a court of appeals. Both the finding of an unfair labor practice and the dismissal of an unfair labor practice complaint qualify as final orders, but neither the certification of a union nor a refusal to certify constitutes a final order. Where the Board certifies a union and the employer objects to the certification (on the grounds of pre-election misconduct, or bargaining unit inappropriateness, for example), the employer may refuse to bargain with the union. A § 8(a)(5) [29 U.S.C. § 158(a)(5) ] complaint alleging an unlawful refusal to bargain will issue against the employer and the Board will issue a summary judgment and a bargaining order. If the employer refuses to comply with the order and forces the case to the court of appeals, the employer will defend by raising the representation issues. (footnotes omitted)[3]

Yet, it is undeniable that the Act on its face does not expressly limit section 160(f) ("final order") review of election orders to situations where an order based on section 158(a)(5) (refusal to bargain) has issued. The Act simply provides that review may be sought only where a "final order" of the Board has issued.[4] The jurisdictional gloss on the statute has been provided by those cases which have held that, where the union has prevailed in an election and has been certified, in order for the employer to obtain review of the election the employer

must first refuse to bargain with the union. Its refusal to bargain constitutes an unfair labor practice under section 158(a)(5). The order then issued by the Board, directing the employer to cease and desist from its refusal to bargain, has been held to constitute a "final order" reviewable under section 160(f). In such cases, it is often asserted that when, and only when, such an order issues, may a representation order be reviewed by the court. *See, e.g., Magnesium Casting Co. v. NLRB,* 401 U.S. 137, 139, 91 S.Ct. 599, 600, 27 L.Ed.2d 735 (1971).

However, it must be remembered that the cases which have established this "gateway to review" by the Courts of Appeal are different in a very significant respect from the case with which we have been presented here. First, all of the Supreme Court cases, and the leading Court of Appeals' cases, in which this requirement of a Section 158(a)(5) "final order" has been stated, are cases encompassing just two categories.

One category consists of cases in which no election has ever been held. See *American Federation of Labor v. NLRB,* 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940); *NLRB v. International Brotherhood of Electrical Workers,* 308 U.S. 413, 60 S.Ct. 306, 84 L.Ed. 354 (1940); *NLRB v. Falk Corp.,* 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396 (1940); *Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964). The other category consists of cases in which an election has been held, the Board has found the election to be tainted, and the "taint" (unfair labor practices) found by the Board, *has been upheld* on court review.

---

**3.** D. Leslie, Cases and Materials on Labor Law (1979) at 103.

**4.** 29 U.S.C. § 160(f) provides, in relevant part:
  (f) Any person aggrieved by a *final order* of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein *the unfair labor practice in question* was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside.

  \*     \*     \*     \*     \*     \*

Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e) of this section, and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner *to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board;* the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive. (emphasis added).

*See Hendrix Manufacturing Co. v. NLRB,* 321 F.2d 100 (5th Cir.1963); *Daniel Construction Co. v. NLRB,* 341 F.2d 805 (4th Cir.1965).

I agree that orders directing elections in both of these categories can only be reviewed after the company has committed the unfair labor practice of refusing to bargain with a certified bargaining agent. The present case, however, does not fall within either category, and indeed, for purposes of review, is so dramatically different that I submit it cannot be, and is not, subject to the same judicial rule.

Here, an election was held in which the employees by a substantial margin chose not to be represented by a union. The four major unfair labor practices found by the Board *have not been sustained* on review by this court. Thus, the crucial difference between this situation, and the cases routinely cited as authority for the Section 158(a)(5) "final order" requirement, is that here the "taint" found by the Board has been held by a Court of Appeals not to exist. The only question then remaining is whether we may review that auxiliary portion of the Board's final order directing that a new election be held—an order which was imposed only because of the Board's finding of unfair labor practices.

## III.

In this situation our analysis must begin with the premise that a free and fair election has already been held [5] and that therefore no reason whatsoever exists for not giving effect to that election. Yet, it is argued that in such a situation, because the "normal" review procedure first requires that the company refuse to bargain (an unfair labor practice) and because this procedure obviously cannot be followed here, no "final order" has issued. Thus, it is claimed, review by this court at this time is not possible under the Act.

I suggest that this cannot be so for three reasons. First, that portion of the Board's order directing a new election constitutes no more than an incidental and remedial aspect of the Board's cease and desist order predicated on unfair labor practices, which we have not sustained. Such an "order" is therefore wholly dependent on the finding and sustaining of the unfair labor practices. Because of this dependence, when the unfair labor practices fall, so too must the dependent and collateral "order," which directs a new election to be held. For certainly, where there is no liability, i.e., unfair labor practices contaminating the election, there can be no remedy and it is manifest that the Board's direction of a new election is no more than a device to remedy the contamination of the original election—a contamination that is now unsupported in the record.

Second, neither the statute nor the cases glossing the statute, require that another and needless second election must now be held in order to vest this court with jurisdiction to set aside an "election order" which should never have been issued in the first place.

Third, not only do I regard the "new election" order as part and parcel of the Board's "final" cease and desist order, so that both are reviewable by us as a "final order", but I also regard reviewability at this time to be required by sheer logic, reason and common sense.

## IV.

### A.

Little more need be said about the first reason I have advanced for finding finality in the Board's order for a new election. It cannot be disputed that, had the Board not found any unfair labor practice—or once having found unfair practices, having de-

---

5. The circumstance here, where only two unfair labor practices affecting two employees have been found to be supported by the evidence and those are held not to have tainted or infected the bargaining unit, is no different from the situation where *no* unfair labor prac- tices have ever been charged and the company has prevailed in the election. In both instances the election reflects the free and fair exercise of the employees' franchise and no reason is presented to set such election aside.

termined that they did not infect the election—no rerun election would have been ordered. It must be obvious that the order for the rerun election is therefore interrelated with and wholly dependent upon the unfair labor practices which have preceded it. The moment that the unfair labor practices, which provide the foundation for a new election, crumble because they are found not to be legitimate, the Board's accessory order for the second election must necessarily fall as well. Thus, treating or regarding the Board's order for a new election as a separate and discrete order which must carry the weight of finality of and by itself in this context, exalts form over substance. Without the four unfair labor practices upon which the Board predicated its election order there can be no new election. Under these circumstances, the Board's order for a new election can no longer survive.

### B.

Does the Act, or do the cases hold otherwise? As I have previously noted, the Act by its terms does not deal with this subject.

What do the cases teach? The cases that have actually addressed this problem [6] have depended wholly upon authorities which are valid only in the context I have addressed earlier, i.e., where no election has ever been held, or where an election, once held, was found by the Board and the reviewing court to be tainted.

Without analysis, these cases, have held that the Board's new election order is not a "final order" and is hence not reviewable.[7] These cases have wrenched the principle, valid in the context in which it was announced, from its proper context and with neither logic nor reason have almost by rote recited the rubric of non-reviewability. In the following section of this opinion I point out how illogical and anomalous it would be to hold the Board's new election order in the present context, unreviewable. Yet without looking beyond the statement of the rule as found in *Falk, supra,* and *AF of L, supra,* complete reliance is placed by these courts on a principle of reviewability having no application to the unique circumstance of a "second-election" case where the original election was not tainted.

I suggest that those cases holding that a Court of Appeals may not review the Board's election order in such a situation have been incorrectly decided and have relied upon authorities that are inapposite.

### C.

In light of reason, let us examine the unique situation which this case would present if we are not permitted to review and set aside the Board's "remedy" of a new election.

---

**6.** *See NLRB v. Intertherm, Inc.,* 596 F.2d 267, 278 (8th Cir.1979); *NLRB v. Monroe Tube Co.,* 545 F.2d 1320, 1329 (2d Cir.1976); *Marine Welding & Repair Works, Inc. v. NLRB,* 439 F.2d 395, 399 (8th Cir.1971); *American Bread Co. v. NLRB,* 411 F.2d 147, 156 (6th Cir.1969); *Holly Hill Lumber Co. v. NLRB,* 380 F.2d 838, 840 (4th Cir.1967); *NLRB v. Lifetime Door Co.,* 390 F.2d 272, 274 n. 3 (4th Cir.1968); *Daniel Construction Company v. NLRB,* 341 F.2d 805, 808–10 (4th Cir.), *cert. denied,* 382 U.S. 831, 86 S.Ct. 70, 15 L.Ed.2d 75 (1965); *Hendrix Manufacturing Company v. NLRB,* 321 F.2d 100, 106 (5th Cir.1963); *Bonwit Teller, Inc. v. NLRB,* 197 F.2d 640, 642 n. 1 (2d Cir.1952), *cert. denied,* 345 U.S. 905, 73 S.Ct. 644, 97 L.Ed. 1342 (1953); *NLRB v. LaSalle Steel Co.,* 178 F.2d 829, 832 n. 1 (7th Cir.1949), *cert. denied,* 339 U.S. 963, 70 S.Ct. 996, 94 L.Ed. 1372 (1950).

Unfortunately the only case cited by the company for the proposition that this court may reverse the Board's order of a second election in the present posture does not even discuss the jurisdictional issue addressed by all the above cases. *NLRB v. General Telephone Directory Company,* 602 F.2d 912, 920 (9th Cir. 1979). The only authority cited for this proposition in *General Telephone* is *Hecla Mining Co. v. NLRB,* 564 F.2d 309, 316 (9th Cir.1977), a case in which representation orders were properly before the court pursuant to an unfair labor practice order after the company refused to bargain with a bargaining representative certified after a fourth election. 564 F.2d at 312. Indeed, in *Hecla Mining,* the Ninth Circuit reiterated its acceptance of the general rule that "review typically occurs when an employer appeals the Board's decision that its refusal to bargain with a union constitutes an unfair labor practice." 564 F.2d at 313.

**7.** As noted, one Ninth Circuit case has held otherwise. *See* n. 6 *supra.*

In this case, we have reviewed the unfair labor practices charged by the union because the Board's order stemming from those charges constitutes a "final order." We have thus affirmed that in the two instances where the record sustains an unfair labor practice we will enforce the cease and desist order (a "final order") entered by the Board. However, the Board has also ordered that a new election be held. It is argued that that portion of the Board's order is *not* a "final order" and that we therefore cannot review it. We are told that despite the fact that no unfair labor practices which contaminated the bargaining unit have occurred, a new election must nevertheless be held.

If a new election is indeed held and the union then prevails and is certified, the employer will then be free to refuse to bargain and by that refusal the employer will have committed an unfair labor practice (§ 8(a)(5)) which will enable a Court of Appeals to review the second election. The employer will then assert, on *that* review, the very same arguments which it has urged in this case, *i.e.*, that the original (here the July 20, 1979) election was a valid election, that it was not tainted by the two unfair labor practices (support for which is found in the record), and that the company having prevailed in the original election, no other election should or could have been held for at least another year. *See* 29

U.S.C. §§ 159(c)(3) and 159(e)(2); *Lamar Hotel*, 137 NLRB No. 136 (1962). In the second election proceeding therefore, the employer uncontrovertibly must be successful in setting aside that election (the second one) and in effectively restoring the situation to the precise situation that obtains now.

It will have done so, however, only after considerable delay, expense and effort, all of which, in light of our holding today that four of the 1979 unfair labor practices (those in connection with the first election) are not supported by the record, will constitute a meaningless and futile exercise.

What if the *company* were to prevail at the hypothetical second election? Then, of course, if no unfair labor practices were charged by the union we can assume that effect would be given to that second election. This, too, however, would not have come about until after a considerable delay and substantial expenditures of time and effort. Such delay would also create the possibility of increased labor management strife during the intervening period, contrary to the basic goals of the NLRA.[8]

If, however, the union had charged that unfair labor practices occurred during this second election, and the Board so finds, but those charges are again found to be unsupported in the record, then under the author-

---

**8.** Perhaps the most basic policy underlying section 9 of the Act is the principle of majority rule as a means of avoiding industrial strife through collective bargaining. *See* 29 U.S.C. § 151 (Findings and Declaration of Policy); 29 U.S.C. § 159(a); House Rep. No. 1147, Committee on Labor, 74th Cong., 1st Sess. p. 8, 20–23; Sen.Rep. No. 573, Committee on Education and Labor, 74th Cong., 1st Sess. p. 1–4, 13–14. The Senate committee stated:

The committee adheres, with the present National Labor Relations Board, to the common belief that the device of an election in a democratic society has, among other virtues, that of allaying strife, not provoking it. Obviously the Board should not be required to wait until there is a strike or immediate threat of strike. Where there are contending factions of doubtful or unknown strength, *or the representation claims of the only organized group in the bargaining unit are challenged, there exists that potentiality of strife*

*which the bill is designed to eliminate by the establishment of this machinery for prompt governmentally supervised elections.*

Sen.Rep. No. 573, p. 22–23, (emphasis added). Thus, the basic policy of the Act is to avoid strife by furthering majority rule, by the holding of prompt, governmentally supervised elections to determine the representative if any desired by the employees. That the determination of the representation claims of unions by election should be prompt and definite is demonstrated not only by the fact that such is necessary to avoid potential strife, but also by various provisions of section 159 which prohibit the directing of elections within one year after the holding of a valid election. 29 U.S.C. §§ 159(c)(3) and 159(e)(2). Thus, overall it is no exaggeration to say that the basic policy of section 9 of the Act is to achieve prompt and definite resolution of representation controversies by means of majority rule in supervised elections.

ities cited by the majority, the Board's order of still another rerun election, once again could not be reviewed.[9]

It thus appears that if in our present situation we were to deny reviewability on the grounds that no final order had been issued, we would end up with an illogical and indefensible result. We would compel one or more elections to be held after the original election—none of which could be given effect. Such a practice could only accentuate the potentiality for industrial strife which the Act itself was enacted to prevent, *see* n. 8, *supra,* and in any event, the result would not change. The original election would be upheld.

### V.

My answer, therefore, to the majority and to those who would read the Board's order narrowly and thereby profess that the Board's new election remedy is not a part of the Board's final order which we may review, is simple and straightforward. The Act, neither by its terms nor in its interpretation, proscribes review at this stage in the situation which this case presents. Logic and reason dictate that we review the remedy and reverse it when no right establishing that remedy has been shown. The cases cited by the Majority and the authorities upon which they rely, either do not address this particular situation, or if they do, they do so unanalytically and unpersuasively, and I suggest, incorrectly.

Thus, it seems indisputably evident that the new election provision of the Board's order must stand or fall with its predicate. The predicate (the unfair labor practices) having fallen, so must the "order" for the election, both being inextricably bound together. The election provision is wholly dependent upon a finding of unfair labor practices that tainted the original election,

and so both must be considered as the final order of the Board.

As the final order of the Board, it is reviewable, and it is reviewable now. I would therefore review the Board's *entire* order and set it aside. To the extent that the majority does not do so, I respectfully dissent.

---

**9.** Even if the union had charged that unfair labor practices were committed by the company and infected the *second* election, and those charges are found to be supported by the record, it could still make no difference to the outcome. For, the fact remains that because the first election, the July 20, 1979 election, has now been held to be valid, all of the proceedings with respect to a second election would be a nullity, since the first election must in such a situation, nevertheless be given effect. *See Hecla Mining Co. v. NLRB,* 564 F.2d 309 (9th Cir.1977) (fourth election, won by union, not given effect in light of fact that third election, rejecting union, was held to be valid.)